## THE FEARLESS.

### (Circuit Court of Appeals, Ninth Circuit.   October 7, 1912.)

#### No. 1,985.

TOWAGE (§ 11*)—STRANDING OF TOW—LIABILITY OF TUG.

 While a dredge operated by a contractor was engaged in government work near the west side of the harbor at Honolulu, with a pontoon bridge and pipe line extending to the eastern side, the tug Fearless, with the schooner Foster in tow, left the inner harbor.   She gave the understood signal for the dredge to open a passage through the pipe line, but, receiving no answer, proceeded without repeating it until near the obstruction, and then repeated the signal, which was at once answered.   Without waiting for the pipe line to be opened, however, which would have been done in 10 or 15 minutes, the tug undertook to take her tow between the dredge and the west side of the channel, which was unsafe and improper navigation, and resulted in stranding the schooner.   After she floated at night, the tug again took her in tow, and again negligently stranded her.   The tug was engaged in working around the harbor, and her master knew all the conditions and channels.   *Held*, that she was in fault, and liable for the injury to the schooner, without reference to any fault on the part of the dredge.

 [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23;  Dec. Dig. § 11.*]

Appeal from the District Court of the United States for the Territory of Hawaii.

Suit in admiralty by Pope & Talbott, a corporation, and others, owners of the schooner Mary E. Foster, against the tug Fearless; J. D. Spreckels & Bros. Company, claimant.   Decree for libelants, and claimant appeals.   Affirmed.

The appellees were libelants in the court below, bringing the original libel against the tug Fearless and the dredge Pacific to recover damages alleged to have been sustained by the schooner Mary E. Foster while in tow of the tug in Honolulu harbor.   The dredge was at the time working near what is called the Ewa, or western, side of the harbor, with a pontoon bridge and pipe line extending from the dredge across to the Waikiki, or eastern, side of the harbor, making it necessary to open the bridge and pipe line to enable vessels to pass over that portion of the channel.   When the tug, with the schooner in tow, approached the place where the dredging operations were going on, the tug gave four whistles, and the dredge answered with a signal which the tug understood to indicate that it should pass with its tow to the west of the dredge, which it undertook to do, and, in passing, the schooner went upon the reef, where she remained for several hours;  the tug Fearless, with the aid of the government tug Manning, being unable to pull her off. At high water, about 10:45 in the evening, she floated off, when the Manning released her hawser, and the tug Fearless, after making a short and sudden pull to prevent the schooner from colliding with the dredger, proceeded with its towing, but with the stern of the schooner first, and the latter was soon aground on the eastern side of the channel, and in the second grounding was seriously damaged.

The original libel alleged that the damage was the result of the negligence of both the dredger and the Fearless.   Both of the respondents filed exceptions, which were sustained, and an amended libel was filed, in which it was, among other things, alleged that the act of the dredger in signaling the tug to pass upon the Ewa side of the channel was one of the proximate causes of the injury, and was an act of negligence, in that the channel on that side of the dredge was not wide enough to permit the passage of the Fearless

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and her tow, which fact the dredge should have known, and that it was, for the same reason, negligence on the part of the Fearless to attempt the passage, and that the act of that tug in so doing was another proximate cause of the grounding. It was further alleged that the second grounding was due to the fact that the Fearless was compelled to tow the schooner stern foremost away from the dredge and towards the eastern side of the channel, making such tow a matter of great difficulty, and making the danger of grounding the schooner on the east side of the channel great, and that the second grounding was due in part to the negligent towing by the Fearless and in part to the negligence of the dredge in indicating that the passage should be made on the Ewa side of the channel, from which side it became necessary for the Fearless to tow the schooner stern first under conditions "that made the operation a dangerous and difficult one, and one which was likely to result in the grounding of the said Mary E. Foster, even though proper care and skill were exercised by those in charge of her and of the said Fearless."

Exceptions were filed to this amended libel, and sustained, whereupon the libel was again amended, omitting the alleged cause of action against the dredger, and the libel as against the latter was dismissed. The last amended libel also omitted the former allegation to the effect that the schooner, when she floated from her first grounding, was in a position that "was likely to result in grounding, even though proper care and skill were exercised by those in charge of her and of said Fearless," and instead thereof alleged that the schooner was then in a dangerous position, with her stem towards the harbor, "but not in such a position that she might not have been towed safely away therefrom; that said Fearless, however, instead of keeping said Mary E. Foster in deep water, as she might have done by the exercise of due and proper care, despite the difficulties of the situation (which difficulties had been caused by said Fearless herself), so negligently towed said Mary E. Foster by heading her towards said reef and running her in dangerous proximity thereto, which she might have avoided doing by the exercise of due and proper care, as to cause said second grounding of said Mary E. Foster."

A decree was rendered in favor of the libelants, from which the claimant of the Fearless appealed.

Nathan H. Frank and Irving H. Frank, both of San Francisco, Cal., and R. W. Breckons and Holmes, Stanley & Olson, all of Honolulu, Hawaii, for appellant.

Kinney, Prosser, Anderson & Marx, of Honolulu, Hawaii (S. H. Derby, of San Francisco, Cal., of counsel), for appellees.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge (after stating the facts as above). We quite agree with the proctors for the appellant that "in applying rules of law to a given case the controlling facts of that case must not be ignored," and therefore we cannot agree in their contention that the cases of The Swan (D. C.) 19 Fed. 455, Potter v. Pettis, 2 R. I. 487, and McCord v. Tiber, 6 Biss. 410, Fed. Cas. No. 8,715, establish the law to be, *in such a case as the present,* that an obstruction to navigation is necessarily "in itself a plain and undeniable fault"; for here the dredge in question was placed in the harbor for the distinct purpose of improving the navigation thereof, under the supervision and direction of a government officer. It was not stationed there for the purpose of directing the navigation of outgoing or incoming vessels. It is true that while the work was going on navigation was obstructed

in that part of the harbor covered by the dredge and its pontoon bridge and pipe line; but among the specific instructions given the dredger by the government officer, as the record shows, was the instruction that no ship should be compelled to go within 50 feet of the edge of the channel, and that every ship should be allowed 200 feet of channel for passing, and that the pipe line should be broken for all passing ships.

That officer, Capt. Slattery, testified, among other things, that as considerable friction had been taking place between pilots and masters, and the captain of the dredger and the contractor, he issued these and other instructions to facilitate proper navigation of the channel on the one hand, and to prevent undue interference with the dredging operations on the other; that he was waited on by a committee of the Pilots' Association, and also by three inter-island captains, and in respect to the opening of the pontoon line he gave these further instructions:

"I instructed all captains, I instructed this committee, these two committees, that when leaving their wharves they were to blow four whistles, so that the contractor would have at least 15 minutes before they reached them, before the ship reached the dredge, during which time to break their pipe line. I instructed them that I would instruct the contractor to answer their whistle by four whistles, which would mean that by the time they arrived they would have the channel clear for them. I instructed them that, if in any case the contractor failed to allow sufficient space for them to pass with safety, they were to break right through the pipe line."

The record further shows that, about 2:20 p. m. of the day of the accident in question, the pipe line extending from the dredger was opened for the passage of three ships. About two hours later the tug Fearless, with the schooner Foster in tow, approached. According to the testimony, when first starting with the tow from the wharf in the inner harbor for the open sea, the tug blew four whistles, which were not answered by the dredger. Without repeating her whistles, the tug proceeded with her tow, and when near the lighthouse blew four more whistles, which were immediately answered by the dredger with four whistles, when the Fearless, at a speed of from 6 to 7 knots an hour, and with a towline from 40 to 50 fathoms in length, proceeded to tow the schooner through that portion of the channel left between the dredger and the westerly edge of the channel—a space, according to the evidence, not exceeding 100 feet in width; one or more of the witnesses stating it to have been not more than from 70 to 100. The narrowness of the channel on the westerly side of the dredge is conclusively shown by the fact that in passing it the schooner struck the dredge on one side, and almost immediately grounded on the other, being at the time almost parallel with the channel. Besides, the channel was not straight at the point in question.

The captain of the tug testified that the four whistles of the dredger meant "everything all clear," and that accordingly he undertook to pass with his tow west of the dredge. The testimony of Capt. Slattery, the government engineer, in respect to that undertaking, is, in effect, that it was neither safe nor proper for the tug to take the schooner west of the dredger, but, on the contrary, that "it was the

height of imprudence for the captain of the tug Fearless to attempt to take any tow through such a narrow passage." The tug undertook to do that in broad daylight, with nothing to obstruct its view. Not only so, but she was in her home port, where she was engaged in towing vessels in and out and about the harbor. Under such circumstances it is well-settled law that she was bound to know the channel, and, conceding that the dredger signaled the tug to pass on the westerly side of her, the tug should have refused to proceed that way under the circumstances disclosed, and with the knowledge with which the tug is properly chargeable. The Margaret, 94 U. S. 494, 497, 24 L. Ed. 146; The Lady Pike, 21 Wall. 1, 22 L. Ed. 499; The Inca (D. C.) 130 Fed. 36.

The tug was also negligent in not repeating its first signal, upon finding that it was not answered by the dredger, which would have afforded the latter ample time within which to open its pipe line, as it had done two hours before for the passage of other ships. Moreover, the tug was authorized, as has been seen, to open the pipe line itself, and could readily have done so within a few minutes; so that, even if the last signal of four whistles given by the tug, and which was responded to by the dredger, was correctly interpreted by the tug to mean that it should pass with its tow westerly of the dredger, instead of waiting for the dredger to open the pipe line or to do so itself, still the tug was clearly in fault. The testimony is that the contractors doing the dredging only required 15 minutes' notice to break the line, and that the actual work in breaking and restoring it only consumed about 10 minutes.

As if to add negligence to negligence, the captain of the tug lengthened his hawser, and, according to his own testimony, steered the tug in passing within 15 feet of a barge (7 or 8 feet wide) which lay alongside the dredger, and when the tug was abreast of the latter ordered "starboard slowly," the direct effect of which was to turn his bow toward the other side of the channel, and when the tug was abreast of the dredger ordered "starboard a little more," which brought the tug to pulling at an angle of from about 40 to 50 degrees from the schooner's bow, the direct tendency of which was to bring the latter against the dredge. In order to avoid such a collision and keep in the channel, the master of the schooner put his helm hard-aport and then immediately put it to starboard again; but the effort was not successful, the schooner struck the dredge, and was then thrown against the edge of the channel, where she stuck. When she floated at high water, about 10:45 in the evening, the master of the tug had become very much intoxicated, and his handling of his tow from that point to the time of her grounding on the opposite side of the channel was too clearly negligent to call for a description of it.

In the circumstances of the case, we think the point made on behalf of the appellant that the schooner assumed the risk of the tug master's intoxication is without merit.

Even if the appellant's contention that the dredger was also liable in damages to the libelant be correct, the action of the trial court in

dismissing the libel as to the dredger was not assigned as error, and as, in our opinion, the appellant is clearly liable for the injuries sustained by the appellee, we affirm the judgment.

The judgment is affirmed.