## THE TEMPLE BAR.

### CONTINENTAL INS. CO. v. TEMPLE STEAMSHIP CO., Ltd.

#### No. 5048.

Circuit Court of Appeals, Fourth Circuit.
July 29, 1943.

sonville and Port Everglades, Florida, and she sailed from the latter port on March 14, 1939 for her destination via Port Royal, Jamaica, the Panama Canal and Comox, which lies on the easterly side of Vancouver Island, British Columbia. To reach this port it was necessary for the vessel to pass along the coast of Oregon and Washington, and while off the coast of Washington she stranded on the Quillahute Needle Rock about one and a half miles southeasterly of James Island Light, and as a result, the vessel, except for some equipment, and the cargo were lost.

The present proceeding was brought by the Steamship Company as owner of the vessel by a petition in admiralty for exoneration from and limitation of liability with respect to the loss. The Insurance Company, as subrogee of the cargo owner's interest, filed a claim in the proceeding alleging a breach by the shipowner of the contract of carriage in that the shipowner failed to deliver the cargo at destination in the same good order and condition as when shipped. The shipowner resisted the claim, contending that the ship was at all times seaworthy and properly manned and equipped, and that the accident was due to negligent navigation by the master and crew.

T. Catesby Jones, of New York City, (Bigham, Englar, Jones & Houston, of New York City, Lord & Whip, of Baltimore, Md., and James W. Ryan, of New York City and George W. P. Whip, of Baltimore, Md., on the brief), for appellant.

Robert W. Williams, of Baltimore, Md., and L. deGrove Potter, of New York City (Ritchie, Janney, Ober & Williams, of Baltimore, Md., Kirlin, Campbell, Hickox, Keating & McGrann and Eugene F. Gilligan, all of New York City, and Southgate L. Morison, of Baltimore, Md., on the brief), for appellee.

Before PARKER, SOPER, and NORTHCOTT, Circuit Judge.

SOPER, Circuit Judge.

On February 16, 1939, Temple Steamship Company, Ltd. of London, owner of the British S/S Temple Bar, entered into a contract with Mutsubishi Shoji Kaisha Ltd. of New York, whereby the steamship was chartered to carry a full cargo of scrap steel from ports in Florida to ports in Japan. The cargo was loaded at Jack-

The charter party provided that the contract should be subject to the terms and provisions of the Harter Act, and that the Paramount Clause should be incorporated, which subjects the contract to the provisions of the Carriage of Goods by Sea Act of April 16, 1936, 49 Stat. 1207, 1213, 46 U.S.C.A. 1300–1315, and invalidates any term of the charter to the extent that it is repugnant thereto. The charter also provided for the delivery of the cargo in accordance with the bills of lading, and the bills of lading incorporated all the terms and exceptions of the charter and acknowledged the receipt of the cargo in good order and condition to be delivered in like good order and condition.

Certain questions of law have been argued which need not be decided in the view we take of the facts. Controversy has arisen as to whether the shipowner should be treated as a private carrier, since the charterer was the shipper of the entire cargo, or had subjected itself to the liabilities of a common carrier because of the reference in the charter to the bills of lading and the contents thereof. The effect of the inclusion of both the

Harter Act and the Carriage of Goods by Sea Act is questioned; and the incidence of the burden of proof with respect to the essential questions of fact has been the subject of debate. The controlling effect of the Carriage of Goods by Sea Act, however, has not been seriously disputed and in it we find the rules which govern the liability of the carrier with respect to the seaworthiness and navigation of the ship.

Section 1303 (1) provides that the carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to (a) make the ship seaworthy; (b) properly man, equip and supply the ship; and (c) make the holds, refrigerating chambers and all other parts of the ship in which goods are carried fit for their reception and carriage.

Section 1304 relates to the rights and immunities of the carrier and the ship. Section 1304 (1) provides that neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and that whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other person claiming exemption under this section. Section 1304 (2) relates to uncontrollable causes of loss and provides that "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship."

The Insurance Company attacks on the ground that the stranding of the ship was caused by unseaworthiness in a number of particulars and on the further ground that the shipowner had not used due diligence to make the vessel seaworthy. The shipowner defends on the ground that the accident was caused solely by the neglect of the master in the navigation of the ship. Each party has offered evidence to sustain this theory and the District Judge, after considering the evidence given by oral testimony and by depositions, made the finding that the loss was caused by bad seamanship and not by unseaworthiness. Our examination of the evidence leads us to conclude that these findings were supported by the greater weight of the evidence so that we approve them without reference to the rule that in an admiralty case the findings of fact of the trial court should not be reversed unless they are clearly wrong. Hodges v. Standard Oil Co., 4 Cir., 123 F.2d 362. Under these circumstances it is not material whether the contract was one of private or of common carriage, or where the burden of proof rested.

The charges preferred by the Insurance Company in the District Court in support of its position are summarized as follows in the court's opinion, The Temple Bar, 45 F.Supp. 608, 614: "The cargo owner makes five charges of unseaworthiness against the vessel: (1) That the compasses were not adjusted by shore adjusters at the loading point as they should have been because of the character of the cargo; (2) that the steering compass was totally or substantially dry during the entire voyage; (3) that the vessel's sounding machine lacked wire during the voyage; (4) that the vessel's charts were improper in that they were (a) too small as to scale; (b) insufficient as to depth data; (c) failed to show James Island light; (d) incorrect as to variation figures; and (5) that the vessel's Coast Pilot was inadequate".

In this court the appellant repeats these charges in detail but places in the forefront of the discussion and emphasizes by frequent reiteration the additional contention that the vessel was unseaworthy and the owner had failed to use due diligence to make her seaworthy because she had been placed in charge of a master wholly unskilled on the route she took, and ignorant of the local conditions she was likely to encounter upon the voyage. The charge that the carrier failed to supply essential equipment is used in this court to accentuate the charge that the carrier failed to provide a master familiar with the route.

■ Foremost amongst the specifications of failure on the part of the owner to furnish essential equipment to the ship is the charge of the appellant that the owner failed to provide the ship with the 1935 edition of the British Admiralty Chart No. 2531 for the North American coast from Cape Mendocino to Vancouver Island. In its place the ship had on board the 1920 edition corrected to 1938. It is said that the latter was defective in that it showed fewer depth marks than the later edition; that it did not show the

location of James Island Light and that it contained misinformation as to variation. The evidence supports the findings of the District Judge, for the reasons given in his opinion, that none of these defects contributed to the stranding or interfered with the proper navigation of the ship. If the master had followed the variation shown on his chart he would have set a more westerly course than he actually did; the St. James light was not shown on the later chart since it was established for small craft entering the Quillahute River; and the contour lines showing 100 fathom and 50 fathom depths were practically alike on both documents. The ship traversed 87 miles outside the 100 fathom contour between noon of April 7, when its position was taken and its course was set, and 8:45 P.M. that evening, when she was still 78 miles distant from the point of stranding. Between that time and midnight she traversed 35 miles between 100 fathom and 50 fathom depths, and after midnight was within the 50 fathom line. Under these circumstances the District Judge was justified in finding that the master could have navigated with safety with the charts on board, because he only had to take soundings, and, if he found himself in diminishing depths, to draw off to the west. The stranding did not occur until 3:30 A.M. on April 8th.

◼ Similarly, we concur in the findings and conclusions of the District Judge set out in his opinion with respect to the other charges that the navigation equipment on board the ship was insufficient. For example, the evidence shows, contrary to the appellant's contention, that the vessel's sounding machine was in good working order, and that the compasses were not injuriously affected by the use of electro magnets in the loading of the ship in Florida during part of one day. There was no substance to the charge that the ship was insufficiently equipped because it was not furnished with the 1935 editions of the West Coast of Central America and United States Pilot, or with a Light List, issued by the British Admiralty. The evidence does not sustain these charges. The British publication on board ship and available to the master contained the warning that navigation along the Pacific Coast should be carried out with due caution because the courses are in general long and must be traversed during frequent periods of thick weather, and because the vessel is subject to the action of currents, the rate and direction of which are uncertain.

We are not left to speculate as to the cause of the disaster since the evidence demonstrates, as the judge found, that it was due to faulty navigation by the master of the ship. The record makes it abundantly clear that the stranding came about by reason of a strong current which carried the vessel from 13 to 14 miles to the easterly of her course and in shore during the fifteen and a half hours which elapsed between noon on April 7, when her position was fixed, and 3:30 A.M. on the next day when she struck the rocks. The existence of strong, uncertain and unpredictable currents off the Pacific Coast of the United States in the neighborhood of the stranding and of a strong easterly current at the time of the accident was shown beyond a reasonable doubt.

It is equally clear, however, that the disaster would not have occurred had the master taken the precaution, required by good seamanship, to check the position of the ship as it proceeded northerly in its course off the coast. The course which he actually laid down would have taken the vessel a safe distance from the dangerous reefs if there had been no current; but at no time during the interval between noon on April 7 and the time of the stranding, did he check his course either by radio cross bearings or by soundings, as he could easily have done. He apparently assumed, contrary to the disclosures of the standard publication at hand, that he would encounter no current that would divert him from his course. His complacence is shown by his failure to act at 2 A.M. on April 8th when the second officer, who had taken over the watch at midnight, went to the master's cabin to report that the vessel had run the estimated distance to a point off Destruction Island Light, which the ship expected to pass at a distance of 18½ miles, but the light was not visible. The captain replied that he did not expect that the light could be seen at that time and directed the mate to call him again if the weather got thicker. An hour and a half later the vessel struck the reef.

◼ It is plain from this review of the case that the evidence offered by the appellant to prove faulty equipment of the ship failed of its purpose, while the evi-

dence offered by the carrier established the fact that the loss was caused by faulty navigation for which, under the terms of the statute, the carrier was not responsible. The appellant, doubtless impressed with the weight of the evidence on the latter point, makes the additional contention on this appeal that a major cause contributing to the stranding was the carrier's negligence at the beginning of the voyage in manning the vessel with a master wholly unskilled on the route and ignorant of the local conditions normally to be expected in the course of the voyage. The master had never navigated the route before and was ignorant of the currents prevalent off the Pacific Coast of the United States; and it is contended that the owner's act in placing such a man in charge of the ship amounted to failure to exercise due diligence to make the vessel seaworthy and actually caused her to be unseaworthy for the voyage when she left Florida enroute for Japan.

To establish this position, chief reliance is placed on the decision in The Lady Pike, 21 Wall. 1, 22 L.Ed. 499, which related to the competency of a master of a steamer which undertook to tow boats up and down a river where piers of bridges impeded navigation. The important point involved is shown by the following statement of the court: (at page 12 of 21 Wall., 22 L.Ed. 499)

" * * * the gravamen of the complaint is that neither the master in charge of the deck nor the pilot had any sufficient knowledge of the craft under their command, nor of the dangers of the navigation in passing down the river in such a steamer with three such barges in tow arranged in the manner before described.

"Proof of the most satisfactory character is exhibited that they did not even know the width of the craft, as the same was arranged, nor the actual distance between the piers where the disaster occurred. On the contrary it appears that they both over-estimated the width of the space between the piers, and under-estimated the width of the tow, including the steamer, as they were arranged abreast, the distance between the two first-named piers not exceeding one hundred and sixteen feet and the width of the whole craft being at least one hundred and five feet."

With respect to such a situation the court held: (at page 14 of 21 Wall., 22 L.Ed. 499) "Ignorance of the danger before them is no sufficient excuse, as the owner appoints the master and is bound to select one of competent skill and knowledge, to transport goods and merchandise shipped on board in safety, which necessarily imposes the obligation to employ a master mariner who knows enough about the route to avoid the known obstructions and to choose the most feasible track for his route. Knowledge of the kind, in river navigation, is peculiarly essential, as the current frequently shifts from one side towards the other, and the track of navigation is often obstructed by snags, sandbars, and shoals, which no degree of skill would enable the mariner or pilot to avoid without a prior knowledge of their existence."

This decision has been followed in other towage cases in which the tug was engaged in towing vessels in and out of harbors or waters with whose local peculiarities the master of the tug by the very nature of the undertaking should have been familiar; The George Hughes, 2 Cir., 183 F. 211; The Fearless, 9 Cir., 199 F. 400; but the decision cannot be accepted as authority for the broad proposition that it is negligent to put a master in charge of a ship, whatever the voyage, unless he is familiar with all the local conditions he may be expected to encounter. If, as in the case at bar, a master, qualified in other respects, is placed in command, and if he is supplied with charts and publications sufficient to enable a competent man safely to navigate the ship, it is not necessary that he should have prior knowledge of local conditions; and lack of it will not cause the ship to be unseaworthy.

It may be added, that in the case at bar not only was the master qualified for his position, but the first officer held a master's license and had had previous experience in navigating the waters off the west coast of the United States.

Affirmed.