DIRECTOR GENERAL OF INDIA SUP-
PLY MISSION For and on Behalf of
the PRESIDENT OF the UNION OF
INDIA, Plaintiff,

v.

S.S. JANET QUINN, her engines, boilers,
etc., et al., Defendants.

No. 64 Ad. 1114.

United States District Court,
S. D. New York.

Dec. 16, 1971.

Baker, Nelson, Williams & Mitchell, New York City, for plaintiff; Robert E. Meshel, New York City, of counsel.

Lilly, Sullivan & Purchell, New York City, for defendants; John J. Purcell, New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

LEVET, District Judge.

This is a libel for cargo damage, tried before the court, the question of the amount, if any, of damages being reserved, only the issue of liability being considered.

The plaintiff seeks to recover for cargo damage sustained during a collision between the S.S. Janet Quinn and M/T Forest Lake and also seeks to recover from the defendants an additional sum which was paid to the defendants as cargo's contribution to the General Average.

The sole issue aside from damages is whether defendants exercised due diligence before and at the beginning of the voyage to make the ship seaworthy in that the vessel was improperly equipped and manned in that it did not possess adequate or up-to-date navigational charts and maps (Carriage of Goods By Sea Act, 46 U.S.C. § 1303).

All references to witnesses and pages, unless otherwise indicated, are taken from the official transcript of testimony of the S.S. Janet Quinn-M/T Forest Lake (1964, Folio) collision litigation which took place in the High Court of Justice, Admiralty Division, in the Royal Courts of Justice, United Kingdom. That trial took place on December 14, 1965, et seq., before Mr. Justice Hewson and Trinity Masters Captains Dunn and D. A. G. Dickens, subsequent to which an opinion and judgment was entered by Mr. Justice Darminski dated January 16, 1967. The parties by stipulation (Ex. 1A) agreed that all the testimony given at the English collision trial be admitted in this court for all purposes.

After hearing the testimony of the parties, examining the exhibits, pleadings and Proposed Findings of Fact and Conclusions of Law and post-trial memoranda submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The court has jurisdiction over the subject matter and of the parties.

2. On June 5, 1963, the defendant Janet Quinn Corporation chartered the S.S. Janet Quinn under a contract of Charter Party (Ex. 1) with plaintiff, India, as charterer, to transport a quantity of wheat in bulk from the United States Gulf to ports in India at a stipulated freight rate (Stip., p. 2, ¶ 5).

3. On July 21, 1963, pursuant to the terms of the aforementioned contract of charter party, the India Supply Mission delivered to the Janet Quinn Corporation and the S.S. Janet Quinn at the port of Pascagoula, Mississippi, approximately 10,174.857 long tons of wheat in apparent good order and condition for shipment to Bhavnagar, India. The India Supply Mission had purchased the wheat in question from Louis Dreyfuss Corporation, Pascagoula, Mississippi, and paid the sum of $652,886.67. Wheat certificates were issued by the Mississippi Department of Commerce Weighmaster confirming the type of grain loaded and two certificates were issued by the National Cargo Bureau confirming the quantity and type of grain loaded. At the time of delivery of said wheat, a bill of loading was issued at Pascagoula, Mississippi by Earl J. Smith & Co., Inc., as agents for the defendant, Janet Quinn Corporation, and, additionally, a mate's receipt was signed on behalf of John Holden Hamby, Master of the S.S. Janet Quinn (Stip., p. 2, ¶ 6).

4. After the entire quantity of cargo was loaded aboard the Janet Quinn, the vessel sailed from Pascagoula, Mississippi, bound for India. On August 23, 1963, while the Janet Quinn was in Suez Bay, in the waters of the United Arab Republic, having gone through the Suez Canal and being about to enter the Red Sea on her way to the Gulf of Aden in the Indian Ocean, the Janet Quinn came into collision with the Dutch registered vessel, Forest Lake. As a result of the collision the Janet Quinn incurred structural damage and, in addition, a portion of the India Supply Mission's cargo of wheat was lost and damaged (Stip., p. 3, ¶¶ 7, 8).

5. Subsequent to the aforesaid collision between the S.S. Janet Quinn and Forest Lake in Suez Bay, United Arab Republic, the defendants declared a General Average situation and the firm of Frank B. Hall & Co., Inc. was appointed General Average Adjustors. The plain-

tiff, India Supply Mission, paid to the General Average Adjustors and the defendants the sum of $99,914.29 as cargo's contribution in General Average (Stip., p. 3, ¶ 9). There is no claim or any waiver by plaintiff and both plaintiff and defendants are agreed that if the defendants are held to be liable on the cargo claim this is also dispositive of the companion claim for recovery of its liquidated sum previously paid in General Average (SM 5, 51).

6. On August 23, 1963, the date of the collision, the Janet Quinn was anchored in Suez Bay at a heading of 65° true, which heading did not vary, in anchorage 2A, with three shackles of anchor chain paid out (U.K.T.-Hamby-Exhibit 18G, p. 3; U.K.T.-Preliminary Acts-Exhibit 18A, p. 2, para. VII). In the southwest side of anchorage 1A, off the Janet Quinn's port bow, lay the Harpula, heading northeast. The Harpula's starboard quarter was a cable length away from the Janet Quinn's bow (U.K.T.-Hamby-Exhibit 18G, p. 4).

7. At 1555 hours on August 23, 1963, the Forest Lake was abeam of the New Port Light and was on a heading of 322°. The Forest Lake was heading to go to an anchorage No. 3A north of the Janet Quinn and was attempting to get there by passing through the gap that existed between the anchored Janet Quinn and the anchored Harpula (U.K.T.-Ru-Exhibit 18F, pp. 17–19).

8. On the date of the collision the chart aboard the Janet Quinn was out of date (Exhibit 7). In 1960 Green Island Light had been moved southward by the United Arab Republic Canal Authorities (Exhibit 20, SM pp. 32–33). A "Notice to Mariners" that Green Island Light had been moved was issued April 1, 1960 (Exhibit 20). The chart aboard the Janet Quinn was corrected and up to date as of January 23, 1960 (Exhibit 7). The Janet Quinn did not have the "Notice to Mariners" dated April 1, 1960 aboard ship at the time of the collision (SM 34). Captain Hamby attempted to obtain an up-to-date chart prior to commencing the voyage. However, he

was unable to do so. Thus, Captain Hamby thought that the chart aboard the Janet Quinn at the date of the collision was up to date (U.K.T.-Hamby-Exhibit 18G, p. 4).

9. The Chief Officer aboard the Janet Quinn was William Harrison Ball who was familiar with the Suez Bay area and knew that Green Island Light had been moved in 1960 approximately 235 yards south (U.K.T.-Ball-Exhibit 18C, pp. 6–7).

10. The fact that Green Island Light had been moved created a variance in the Janet Quinn's charted position when anchored of 9/10 of a cable to the south (U.K.T.-Hamby-Exhibit 18G, p. 21).

11. Captain Hamby's estimate of the distance between his vessel, the Janet Quinn, and the Harpula was visual and was not based on an examination of the ship's chart. Captain Hamby was informed by the pilot that he (the pilot) placed the tanker Harpula in anchorage 1A. The pilot told Captain Hamby that the Harpula was outside anchorage 1A but that her anchor was within anchorage area 1A (U.K.T.-Hamby-Exhibit 18G, pp. 22–23).

12. Pilot Awad Daadour boarded the Janet Quinn at 3:36 P.M. (Ex. 3A, August 23, 1963) and informed Captain Hamby that the Janet Quinn would not get under way until the Forest Lake cleared the channel (U.K.T.-Hamby-Exhibit 18G, pp. 4–5).

13. I FIND THAT THE CAUSES OF THE COLLISION BETWEEN THE JANET QUINN AND THE FOREST LAKE WERE AS FOLLOWS:

*First:*

The Janet Quinn getting under way when she did.

Pilot Daadour and Captain Hamby watched the Forest Lake come up the channel. The pilot informed Captain Hamby that the Forest Lake was clear of the channel and changing her course. Pilot Daadour instructed heaving up the anchor. Captain Hamby complied although the Forest Lake was heading for

the Janet Quinn's bridge. Captain Hamby asked the pilot to confirm the fact that the Forest Lake would pass around the Janet Quinn's stern in proceeding to its anchorage. The pilot gave this confirmation (U.K.T.-Hamby-Exhibit 18G, pp. 4–6, 27, 29, 30). In order to prevent the collision the Janet Quinn should not have gotten under way when she did (U.K.T.-Hamby-Exhibit 18G, p. 31; U.K.T.-Judgment-Exhibit 18B, p. 10; Captain Seeth SM 18).

I find that Captain Hamby ordered the Janet Quinn under way relying on information he had received from Pilot Daadour. Captain Hamby believed that the compulsory pilot aboard the Forest Lake had received instructions to pass astern of the Janet Quinn. Pilot Daadour had so informed Captain Hamby of this. I find that without this information from Pilot Daadour, Captain Hamby would not have gotten under way since he did not have personal knowledge whether or not the Forest Lake would pass ahead or astern of the Janet Quinn (U.K.T.-Hamby-Exhibit 18G, pp. 30–31).

I find that there was ample room for the Forest Lake to pass between the Janet Quinn and the Harpula provided that they remained at anchor. The exact distance between the Janet Quinn and the Harpula is uncertain. According to Captain Hamby the Janet Quinn was about 608 to 1,000 feet away from the Harpula (U.K.T.-Hamby-Exhibit 18F, pp. 4–5). According to Chief Officer Ball the distance between the two ships was about 1,000 feet (U.K.T.-Ball-Exhibit 18C, p. 2). The Chief Officer of the Harpula estimated that the distance between his ship and the Janet Quinn was half a mile (U.K.T.-Judgment-Exhibit 18B, p. 7). The English court concluded, and I concur, that the distance betweeen the two ships was between half and a quarter of a mile, but in any case no less than a quarter of a mile (U.K.T.-Judgment-Exhibit 18B, p. 7).

14.

*Second:*

The Janet Quinn failed to haul down its anchor ball after the ship had gotten under way (U.K.T.-Judgment-Exhibit 18B, p. 12; U.K.T.-Ru-Exhibit 18F, pp. 18–19).

The anchor ball remaining up indicated to the captain of the Forest Lake that the Janet Quinn was still stationary and that the Forest Lake could continue to proceed to pass between the Janet Quinn and the Harpula (U.K.T.-Ru-Exhibit 18F, pp. 18–19).

15.

*Third:*

The Janet Quinn violated Rule 19 of the International Rules of the Road.

Rule 19 provides:

"When two power driven vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

(International-Inland Rules of the Road, United States Coast Guard, September 1, 1965; Rules of the Nautical Road by Farwell, United States Naval Institute.)

Under Rule 19 the Janet Quinn was the burdened vessel and the Forest Lake was the stand-on ship. The Forest Lake was right and had a duty to maintain its course and speed whereas the Janet Quinn was obligated to give way. The Janet Quinn's failure to avoid the Forest Lake caused the collision (U.K.T.-Judgment-Exhibit 18B, p. 13; U.K.T.-Third-Exhibit 18D, p. 6).

16. I find and conclude that the causes of the collision between the Janet Quinn and the Forest Lake were navigational and operational and in summary were as follows:

(1) The Janet Quinn getting under way when she did, pursuant to the instructions of Pilot Daadour and the orders of Captain Hamby.

(2) The failure of the Janet Quinn to haul down its anchor ball before getting under way.

(3) The Janet Quinn violating Rule 19 of the International Rules of the Road and thus failing to avoid the Forest Lake.

17. I find for the foregoing reasons that the out-of-date chart aboard the Janet Quinn was not a cause of the collision between the Janet Quinn and the Forest Lake.

18. I find that plaintiff's contention that the Janet Quinn was improperly manned in that the master, Captain Hamby, was not familiar with international whistle signals, was not set forth in the pleadings, but I find that in fact the Janet Quinn was not improperly manned (see Discussion).

(a) Captain Hamby was a ship's master who had received an American Master's License in 1931 and has sailed in the capacity of Master since 1941. He also held pilot's licenses for approximately twenty ports in the United States (U.K.T.-Hamby-Exhibit 18G, p. 2). Furthermore, Chief Officer Ball had a Master's License for any tonnage, any ocean, and a radar observer's certificate since 1948. His total experience at sea was about thirty-eight years. Chief Officer Ball had been sailing to Suez Bay for twenty years prior to August 23, 1963 (U.K.T.-Ball-Exhibit 18G, p. 1).

(b) Captain Hamby thought that the blast he heard from the Harpula was a starboard helm signal, although it was a prolonged blast (U.K.T.-Hamby-Exhibit 18G, p. 35). Chief Officer Ball thought that the blast from the Forest Lake indicated a helm change (U.K.T.-Ball-Exhibit 18C, p. 3). Furthermore, Pilot Daadour was confused about the blast and also thought it was a starboard helm whistle (U.K.T.-Hamby-Exhibit 18G, p. 35).

(c) I find that Captain Hamby was familiar with the canal regulations prior to and at the time of the collision (U.K.T.-Hamby-Exhibit 18G, p. 35). Moreover, all the regulations and laws pertaining to navigation in the canal area were known to Egyptian Pilot Daadour who board the Janet Quinn at Port Said (Exhibit 26-Testimony of Daadour, p. 2; U.K.T.-Hamby-Exhibit 18G, p. 30).

## DISCUSSION

Plaintiff, India Supply Mission, delivered to the Janet Quinn Corporation, operators of the S.S. Janet Quinn, wheat for shipment to Bhavnagar, India. En route, the Janet Quinn was involved in a collision with the Dutch registered M/T Forest Lake. As a result of said collision a portion of plaintiff's cargo of wheat was lost and damaged. Subsequent to the collision defendants declared a general average situation. Plaintiff made contributions to the general average. The India Supply Mission seeks recovery for damage to its cargo and its contribution to the general average.

The Carriage of Goods By Sea Act, 46 U.S.C. § 1300 et seq., exempts losses from unseaworthiness unless caused by failure to use due diligence to make the vessel seaworthy. Spencer Kellogg & Sons, Inc. v. Great Lakes Transit Corp., 32 F.Supp. 520 (E.D.Mich.1940). Accordingly, the sole issue in this case is whether the evidence shows that defendant exercised due diligence to place and maintain the S.S. Janet Quinn in seaworthy condition for the voyage on which the damage occurred. More specifically, the question is whther defendant exercised due diligence in maintaining up-to-date navigational charts and whether any failure to maintain up-to-date charts was a cause of the collision in question.

Defendant contends it exercised due diligence to make the Janet Quinn seaworthy prior to and at the beginning of its voyage by procuring as far as defendant was able up-to-date navigational charts. The chart used by defendant was up to date as of January 23, 1960. The Janet Quinn did not have aboard ship the "Notice to Mariners" dated April 1, 1960, which gave notice that Green Island Light had been moved. Defendant argues that the damage to the wheat was not caused by any failure on its part to make the vessel seaworthy in the exercise of due diligence in obtaining up-to-date navigational charts.

The burden of proof of the exception of due diligence is upon the defendant. 46 U.S.C. § 1304(1); The Southwark, 191 U.S. 1, 13, 24 S.Ct. 1, 48 L.Ed. 65 (1903). The exception of due diligence is one strictly construed against the carrier warranting a seaworthy vessel. Compagnie Maritime Francaise v. Meyer, 248 F. 881, 885 (9th Cir. 1918). As Judge Learned Hand observed in Metropolitan Coal Co. v. Howard, 155 F.2d 780, 783–784 (2nd Cir. 1946), "the warranty of seaworthiness is a favorite of the admiralty and exceptions to it or limitations upon it, are narrowly scrutinized."

Defendant claims that damage to plaintiff's cargo of wheat was caused by the negligence of the pilot and captain aboard the Janet Quinn and not because the charts aboard the Janet Quinn were out of date. The carrier is exempt from liability under 46 U.S.C. § 1304, which provides as follows:

"(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship sea worthy, and to secure that the ship is properly manned, equipped, and supplied * * *.

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from— (a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship * * *."

In American Tobacco Company v. Goulandris, 173 F.Supp. 140, 168 (S.D. N.Y.1959), the court in discussing the application of 46 U.S.C. § 1304(1) stated:

"Section 4, Subd. (1) of the Act (46 U.S.C. § 1304(1)) means that a cargo owner claiming damage resulting from unseaworthiness must first prove the affirmative of that issue, and if he does, then the carrier to gain exoneration from liability, must prove that it exercised due diligence. If [the cargo owner] fails to establish that the ship was unseaworthy in some respect which caused the damage, then the question of due diligence becomes academic. See The Temple Bar, D.C., 45 F.Supp. 608, 613, affirmed 4 Cir., 137 F.2d 293."

It must be emphasized that the statute specifically exempts the carrier from liability when the cause of the collision is navigational.

## THE CHART

Defendant contends that the Janet Quinn was seaworthy in all respects in spite of the fact that HO Chart No. 5435 was not replaced by an up-to-date chart at the commencement of the voyage. Defendant anticipated that a compulsory Egyptian pilot would board the vessel upon its arrival at Port Said, that the pilot would navigate the vessel through Port Said, the Suez Canal and the Port of Suez to the Red Sea. In this instance, the Suez Canal pilot navigated the vessel through the Suez Canal and anchored the Janet Quinn in the Bay of Suez in an area designated as anchorage "2A." When the Janet Quinn was ready to leave its anchorage in the Bay of Suez, an Egyptian pilot, Awad Daadour, boarded the Janet Quinn in order to navigate her through that port to the Red Sea. The pilot was familiar with the area where the vessel was anchored. Consequently, he had no reason to refer to a chart in order to navigate the vessel from its anchorage to the Red Sea.

It is established law that there must be a causal connection between the loss sustained and the unseaworthy condition claimed. If a ship is found to be unseaworthy and due diligence has not been exercised to prevent the unseaworthy condition a shipowner would not be liable unless there is a causal connection between the loss and the unseaworthy condition. American Tobacco Company v. Goulandris, 173 F.Supp. 140 (S.D.N.Y.1959); Hartford & New York Transportation Company v. Rogers & Hubbard Company, 40 F.2d 954 (D.C. Conn.1930); The Temple Bar, 45 F.

Supp. 608 (D.Md.1942), affirmed 137 F.2d 293 (4th Cir. 1943).

■ The Suez Canal chart aboard the Janet Quinn was out of date. The out-of-date chart, however, had nothing whatsoever to do with the collision. While it is true that the incorrect chart placed the Janet Quinn one ship's length closer to the Harpula, the evidence does not support plaintiff's contention that the out-of-date chart was a cause of the collision nor that Captain Hamby's decision to get under way was based upon the incorrect chart.

## CAUSES OF THE COLLISION

### A. GETTING UNDER WAY

The collision between the Janet Quinn and the Forest Lake was due to a number of factors, the foremost of which was the Janet Quinn getting under way when she did. The pilot aboard the Janet Quinn directed Captain Hamby to heave up anchor. Thus, Egyptian pilot Awad Daadour, referring to the Forest Lake, declared: "She [the Forest Lake] is all clear now and she is changing her course to the proper channel. Go ahead and heave up anchor." (U.K.T.-Hamby-Exhibit 18G, pp. 4–5) When the pilot gave this instruction, Captain Hamby saw the Forest Lake "heading right for our bridge." Even so, the pilot directed to heave up the anchor and confirmed to Captain Hamby that the Forest Lake would pass astern of the Janet Quinn (U.K.T.-Hamby-Exhibit 18G, pp. 4–5). When the Forest Lake was a half mile or so away from the Janet Quinn, Captain Hamby asked the pilot's advice, "if we should not go full astern." Pilot Daadour replied, "No, no captain. That would mean sure collision. That ship is bound to go to port." (U.K.T.-Hamby-Exhibit 18G, p. 6; U.K.T.-Judgment-Exhibit 18G, p. 5)

The English Court concluded that the Janet Quinn was wrong in getting under way when she did. "I have to deal next whether or not the 'Janet Quinn' was right to get underway when she did. It occurs to me * * * that the obvious thing for her to do, having seen the 'Forest Lake' coming past the Newport Rock towards an anchorage while waiting her turn to get into the Suez Canal, was to wait until she had anchored. It was a matter I do not think can have held the Janet Quinn up for more than a few minutes * * * and then this accident would never have occurred." (U.K.T.-Judgment-Exhibit 18G, p. 10)

Plaintiff is correct in its contention that the out-of-date chart and its erroneous information as to the position of Green Island Light was actually used by the officers of the Janet Quinn to plot its position in Suez Bay. This was not, however, a cause of the collision. Hence, I concur with the findings of the English Court, which stated:

"The position of Janet Quinn when anchored is not easy, or indeed possible, to define accurately. One of the difficulties is that she was using an out-of-date chart, for a reason that I do not understand, and she had taken a fix on the Green Island Light. This on her chart was a different position from that to which it had been moved in 1963. *That in fact had no bearing on the cause of this collision* but it made the plotting of her position a good deal more difficult than it should have been . . . ." (U.K.T.-Judgment-Exhibit 18B, pp. 5–6) (Emphasis added)

It was the intention of the Captain aboard the Forest Lake to pass between the Janet Quinn and the Harpula on its way to anchorage. There was ample room for the Forest Lake to pass between these two ships provided that they remained at anchor. If the Janet Quinn had not gotten under way when she did the Forest Lake could have safely passed between the two ships to her anchorage.

### B. FAILURE TO LOWER THE ANCHOR BALL

A second cause of the collision was the fact that the Janet Quinn had not lowered her anchor ball when getting under

way. It is established procedure of the sea that when a ship is getting under way the anchor ball is to be lowered. The anchor ball on the Janet Quinn remained raised until just prior to the collision. Under these conditions the conclusion reached by the English Court is sound: "It seems to me that a mariner seeing two ships at anchor both with anchor balls hoisted [the Janet Quinn and the Harpula] is entitled to assume that they are both anchored as the signs indicate." (U.K.T.-Judgment-Exhibit 18 B, p. 12)

## C. VIOLATION OF RULE 19

A third cause of the collision was that the Janet Quinn violated Rule 19 of the International Rules of the Road. Under Rule 19 the Janet Quinn was the giveway ship and the Forest Lake was the stand-on ship. Accordingly, the Janet Quinn was wrong in maintaining her course and speed. The Janet Quinn should have given way to the Forest Lake which had a right and duty to maintain her course and speed. It is clear that the Janet Quinn's failure to avoid the Forest Lake caused the collision.

## D. NAVIGATIONAL

For the foregoing reasons the cause of the collision between the Janet Quinn and the Forest Lake was navigational or operational. If plaintiff had made an adequate showing that the proximate cause of the collision was the use of the out-dated chart, then there would be no question that the defendant would be liable; but such is not the case. Plaintiff has not shown that the chart was a cause of the collision. No navigational error flowed from the out-dated chart.

## IMPROPER MANNING

### PLEADINGS

Plaintiff in its post-trial papers argues an alternative ground for recovery, namely, improper manning. Plaintiff claims that the Janet Quinn was improperly manned in that the master was not familiar with the meaning of whistle signals and that this lack of knowledge was a cause of the collision.

Plaintiff seeks recovery under 46 U.S. C. § 1304, which provides:

"(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied * * *."

This court finds that this claim of plaintiff does not appear in the pleadings and is only raised in plaintiff's post-trial papers. (Plaintiff filed two sets of proposed findings of fact, one dated September 16, 1971, four days before trial, and the other subsequent to trial.) Plaintiff claims that it raised this issue in a supplemental pretrial order which reads as follows:

"Pursuant to paragraphs 4A, 24 of the Pre-Trial Order in this matter, the plaintiffs INDIA SUPPLY MISSION hereby gives notice that it intends to call as an expert Master Mariner William Ash.

"In addition to the foregoing, the issues set forth in paragraph 9 should include all the plaintiff's contentions of unseaworthiness which are alleged in paragraph 3B."

It is clear that there has been no claim of or reference to improper manning.

Plaintiff further contends that paragraph (3B) (a) of the pretrial order alleges improper manning. This section of the pretrial order provides:

"(a) Plaintiff, India Supply Mission, asserts that the defendants failed and neglected to exercise 'due diligence' within the meaning of United States Carriage of Goods By Sea Act to make the S.S. JANET QUINN seaworthy for her voyage to India, in that, among other things, the vessel was improperly equipped and manned in that it did not possess adequate or up-to-date navigational charts and maps to enable her to proceed safely

to the ultimate port of destination in India."

Again, there is no specific claim or reference to improper manning in that the master of the Janet Quinn did not understand certain whistle signals prior to collision. Furthermore, plaintiff's claim of improper manning was not raised in any other pre-trial papers. It must be stated that at trial there was a superficial reference to the issue of manning which was as follows:

"MR. MESHEL: We claim there was patently unseaworthy vessel, improperly manned and equipped. We attempted to show—

"THE COURT: Manned? Is that new to this case?

"MR. MESHEL: No, your Honor. I don't think it should be.

"THE COURT: Is is pleaded?

"MR. MESHEL: It was pleaded." (SM 11)

It is elementary procedure that the issues to be resolved by the court must be in the pleadings. In light of plaintiff's failure to raise the claim of improper manning, except in its post-trial papers and superficially at trial, the court is not required to come to a determination regarding this issue. However, I shall briefly discuss the claim of improper manning.

### THE WHISTLE SIGNAL

Just prior to collision the Forest Lake sounded a blast which the English Court has determined to be a prolonged blast. If when this blast was sounded the Janet Quinn put her engines full astern, the collision may never have occurred.

Captain Hamby misinterpreted the nature of the blast, thinking that it was a helm or turning signal. Captain Hamby testified at the English trial:

"QUESTION: The short point is this. What you heard was a prolonged blast and you interpreted it as a helm signal. That is the short point.

"ANSWER: Yes, that is correct." (U.K.T.-Hamby-Exhibit 18G, p. 43)

Captain Hamby's understanding of the blast was an error in navigation and not incompetency. He was familiar with the different international signals. Indeed, at the English trial he testified:

"QUESTION: You think it would be a short blast?

"ANSWER: Yes, under International Rules of the Road.

"QUESTION: What about them?

"ANSWER: In the Canal we have one second as a short. Four seconds is a long.

"QUESTION: Is it your evidence that the length of signals in the Suez Canal is different from that in the International Regulations?

"ANSWER: No . . . ."

Captain Hamby was a ship's Master who had received an American Master's License in 1931. He has been sailing in the capacity of Master since 1941 and holds pilot's licenses for approximately twenty ports in the United States. He was not on his first voyage through the Suez waters. He has sailed these waters for many years and was quite familiar with the area and familiar with proper procedure.

Captain Hamby was not incompetent in that he did not understand international whistle signals. He merely took the four-second whistle blast of the Forest Lake as a short blast. If he had recognized the blast of the Forest Lake as a long blast he would have put his ship full astern (U.K.T.-Hamby-Exhibit 18G, p. 35). Furthermore, Chief Officer Ball, an experienced seaman, was also confused by the signal. Ball thought that the blast from the Forest Lake indicated a helm change for he, too, took the blast as a short blast (U.K.T.-Ball-Exhibit 18C, p. 3).

Captain Hamby was not incompetent in that he did not understand international whistle signals and his confusion was an error in navigation. A ship owner is not liable when he selects a Master

who has the usual certificates and had good recommendations. Phillips v. United States, 286 F. 631 (D.C.Md.1923). Captain Hamby was a qualified and experienced Master. The law is clear, the owner who has appointed a competent Master is entitled to reply on the Master's judgment in navigation and should not hamper further exercise of his judgment with instructions and orders. President of India by and through Director of India Supply Mission v. West Coast S.S. Co., 213 F.Supp. 352 (D.C. Or.1962), affirmed 327 F.2d 638, cert. denied 377 U.S. 924, 84 S.Ct. 1222, 12 L.Ed.2d 216 (1964). A ship owner is not liable for damage to cargo caused by error or neglect in navigation. American Metal Company v. M/V Belleville, 284 F.Supp. 1002 (S.D.N.Y.1968).

In conclusion, the collision between the Janet Quinn and the Forest Lake was caused by the neglect of the pilot and Master. The loss was caused by bad seamanship and not by unseaworthiness for which, under the terms of the statute, the carrier is not responsible.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the subject matter and of the parties.

2. The rights of the parties are governed by the Carriage of Goods By Sea Act, 46 U.S.C. § 1300 et seq.

3. The plaintiff has failed to establish by a fair preponderance of the credible evidence that the S.S. Janet Quinn was improperly equipped. The fact that it did not possess adequate or up-to-date navigational charts and maps was not the proximate cause of the damage to or loss of plaintiff's cargo.

4. The damage to and loss of plaintiff's cargo was caused by the Janet Quinn's (a) getting under way when she did pursuant to the instructions of the pilot and the orders of the Master; (b) failure to lower the anchor ball when getting under way; and (c) failure to comply with the International Rules of the Road for crossing situations.

5. Plaintiff has failed to establish by a fair preponderance of the credible evidence that the Janet Quinn was improperly manned.

6. The collision between the S.S. Janet Quinn and the M/T Forest Lake was caused by errors in navigation. The loss was caused by bad seamanship and not by unseaworthiness. Hence, under the terms of the statute, the defendant is not liable.

7. Plaintiff's claim for damage to its wheat is dismissed.

8. Plaintiff's claim for reimbursement of the amount contributed in the general average is also dismissed.

Defendant is entitled to a judgment dismissing the complaint together with the costs of this action.

Settle judgment promptly upon notice pursuant hereto.