Complaint of TUG OCEAN PRINCE, INC. and Red Star Towing & Transportation Company, as Owner and Charterer of the TUG OCEAN PRINCE, for Exoneration from or Limitation of Liability, Plaintiffs and Third-Party Plaintiffs,

v.

UNITED STATES of America, Third-Party Defendant.

UNITED STATES of America, Plaintiff,

v.

PITTSTON MARINE TRANSPORT CORPORATION, Red Star Towing & Transportation Company, Tug Ocean Prince, Inc.,

and

TUG OCEAN PRINCE and BARGE NEW LONDON, in rem, Defendants.

Nos. 74 Civ. 3358(GLG) and 75 Civ. 5801(GLG).

United States District Court, S. D. New York.

Sept. 6, 1977.

---

**27.** 1973 Fed.Sec.L.Rep. (CCH) ¶ 93,974 (S.D.N.Y.1973) (permanently enjoining these defendants on the basis of the scheme now before us).

908

Healy & Baillie, New York City, for plaintiffs and third-party plaintiffs; John D. Kimball, New York City, of counsel.

McHugh, Heckman, Smith & Leonard, New York City, for defendant, Pittston Marine Transport Corp.; Maurice F. Beshlian, New York City, of counsel.

Gilbert S. Fleischer, New York City, in charge, for the third-party defendant and plaintiff, United States of America Admiralty & Shipping Section Dept. of Justice; Janis G. Schulmeisters, New York City, of counsel.

## FINDINGS OF FACT

GOETTEL, District Judge.

1. At all material times Tug Ocean Prince, Inc. was, and still is, a New York corporation and the owner of the Tug OCEAN PRINCE. Red Star Towing & Transportation Company (hereinafter collectively referred to with Tug Ocean Prince, Inc. as "Plaintiffs"), was, and still is, a West Virginia corporation with an office and principal place of business in New York, and at all material times was the charterer of the Tug OCEAN PRINCE, and

manned, victualed, supplied and operated said Vessel.

2. The Tug OCEAN PRINCE is a United States documented, steel hulled, diesel driven, single screw, 1,800 horsepower tugboat built in 1958, having an overall length of 94.7 feet, an extreme breadth of 27.1 feet and a deep draft of about 13 to 14 feet. Her registered gross tonnage is 198 tons and her registered net tonnage is 134 tons.

She was at all material times equipped with direct pilothouse engine controls, a gyro compass, a magnetic compass, a Decca radar and a searchlight. Her chart for the area was a 1969 edition. Although a subsequent edition was available, there were no material differences between the charts in the location and characteristics of the relevant aids. Buoy "21" had been renumbered to Buoy "25".

3. Red Star had no written procedure for supplying its tugs with navigational information or material. The ordering of charts was left to the captain without the office having a system to check what charts and other navigational publications were needed. Red Star had no procedure for checking that this material was obtained by the Captains. On the voyage in question, the OCEAN PRINCE was carrying current editions of the Light List and Coast Pilot.

4. Red Star Towing & Transportation Company (hereinafter singly referred to as "Red Star") is engaged in the business of general towage in the coastal and inland waters of the United States, including New York Harbor and its tributaries.

5. Red Star Marine Services, Inc. is a company which at all material times provided "management services" for Red Star, including "operations" such as booking of work, scheduling and dispatching of tugs to accomplish that work, hiring and firing of personnel, and overseeing the total operation of the Red Star fleet which includes the Tug OCEAN PRINCE.

6. Red Star and Red Star Marine Services, Inc. are related companies, and have the same president, Mr. Robert W. Sanders.

7. Walter Kristiansen at all material times was vice-president of operations of Red Star Marine Services, Inc.

8. The Red Star companies are also related to the Bushey shipyard at Brooklyn, New York and the various Bushey companies in the New York Harbor area.

9. Red Star has offices at 500 Fifth Avenue, New York, New York, where its tug dispatchers are located.

10. The dispatchers of another related company, at all materials times, were located in the same offices, and used the same radios and frequencies.

11. Captains, Relief Captains, Mates and other crew members serving on Red Star tugs are hired by Red Star Marine Services, Inc. but are paid by Red Star.

12. Red Star Marine Services, Inc. had internal requirements for the hiring of navigators, which included a requirement that Tug Captains and Mates it employed either have or obtain a Coast Guard license for the operation of Red Star tugs as a condition to their employment, which company policy preceded subsequent Coast Guard licensing requirements. In addition, when one of the navigators was unfamiliar with the area the tug was dispatched to, Red Star's policy was that the other navigator have extensive experience in and be familiar with the area, and that this man be available to assist the other navigator whenever necessary or if requested by the man on watch.

13. Pittston Marine Transport Corporation (hereinafter "Pittston") is a New York corporation and, at all material times, was engaged in the business of transporting petroleum cargoes by barge in, among other places, New York Harbor and its tributaries. At all material times Pittston owned, operated, manned, victualed and supplied the tank barge NEW LONDON, of 1,665 gross and net tons and having overall dimensions of 295 feet in length and 43 feet in breadth. The Barge is equipped with a pushing well or notch at its stern into which the bow of a pushing tug fits, providing motive power and steering control.

14. The United States of America (hereinafter the "Government") is a sovereign

which, under the auspices of the Coast Guard, establishes, maintains and operates an aids to navigation system on the entire length of the Hudson River in the State of New York. It does so under statutory authority to serve, *inter alia*, the needs of the commerce of the United States. (14 U.S.C. § 81).

15. On February 2 and 3, 1974, the Tug OCEAN PRINCE carried a full crew of six men including two United States Coast Guard licensed (for uninspected towing vessels not more than 200 miles off-shore) navigators, John Kiernan and Walter Reimer, two deckhands, an engineer and a cook.

16. At all relevant times, Mate Reimer held a valid license issued by the United States Coast Guard which gave him authority to serve as operator of uninspected towing vessels upon the inland waters of the United States, including the Hudson River. Reimer had been a Tug Captain for five years, and was qualified generally to serve as a Tug Captain, although he had never before navigated the Hudson River. He had served as a deckhand on tankers on the Hudson River briefly some six years earlier. He worked for Red Star in the capacity of Captain, Relief Captain and Mate, principally on board the OCEAN PRINCE, for a period of one and one-half (1½) years before the voyage in question.

17. Kiernan was also licensed by the Coast Guard and had extensive experience as a Tugboat Captain on the Hudson River which spanned a period of more than 30 years. He was employed by an associated company as a Tug Captain, but was temporarily assigned to Red Star to fill a vacancy on the Tug OCEAN PRINCE and went on board on February 1, 1974.

18. During the voyage in question, Kiernan and Reimer stood alternating six hour watches, with Kiernan standing the 6:00 to 12:00 watches in the morning and evening and Reimer standing the 12:00 to 6:00 watches. One deckhand was assigned to each watch. The Captain or Mate of the watch did the steering and navigating. The deckhand performed various chores, such as line handling, general maintenance on board the tug, and, if requested by the Captain or Mate, lookout duties, steering under the Captain's or Mate's supervision, and getting coffee, all of which were well known to Red Star's vice-president of operations.

19. Prior to the voyage in question, the Tug OCEAN PRINCE had operated in southern waters, in Georgia, Florida, Texas and Louisiana for over a year. During December of 1973 and January of 1974, it operated in and about New York but Reimer was on vacation at that time. He rejoined the Tug in New York on February 2, 1974 at the Bushey shipyard in Brooklyn. Kiernan was already on board. Kiernan had never met Reimer before February 2, 1974, but knew that he was regularly assigned to the OCEAN PRINCE. He was not advised and was unaware of Reimer's lack of familiarity with the Hudson River.

20. While the plaintiffs knew that Reimer lacked familiarity with the Hudson when he rejoined the OCEAN PRINCE on February 2, it was assumed that this lack of experience would be discussed between Reimer and Kiernan when they met on the vessel.

21. Red Star's Personnel Department was responsible for designating the Captain of the Vessel. Red Star intended Kiernan would be Captain. Kiernan indicated doubt in his own mind that he was Captain, but he took certain steps which were appropriately done by the Captain. It is the Captain's duty to know the experience and qualifications of the Mate.

22. On Friday, February 1, 1974, Pittston phoned in an order to Red Star, advising that it would need a tug to tow its Barge NEW LONDON to Kingston, New York sometime during the weekend. The order was entered on a job order card, which was given to the tug dispatcher's office. In response to Pittston's order, the dispatcher, Philip Keenan, decided to assign the Tug OCEAN PRINCE to do the job, and did so at 1800 hours on February 2nd. Keenan did not discuss with Kiernan or Reimer who was to be Captain and who the Mate.

23. Keenan was aware of the make-up of the pilothouse crew on the OCEAN PRINCE on February 2nd, and had been told by the day dispatcher, Robert Fitch, that Kiernan was Captain and Reimer was Mate. Keenan was aware of Reimer's lack of experience as a navigator on the Hudson. He decided, however, that the OCEAN PRINCE would be suitable for the voyage since Kiernan, who had extensive experience as a tug navigator on the Hudson River, was on board and would be available to assist Reimer if necessary. He also assumed Reimer's lack of experience on the Hudson River would be discussed between Kiernan and Reimer. The dispatcher's decision to assign the OCEAN PRINCE to the NEW LONDON job was in accordance with accepted practice in the tugboat industry of dispatching a tug to an area one of the navigators had not navigated before so long as the other navigator on board has experience in the area.

24. From the Bushey shipyard the OCEAN PRINCE, with Kiernan on watch, proceeded to Esso dock in Bayonne, New Jersey, and made up to the loaded Barge NEW LONDON. Reimer, who was off-watch, nevertheless assisted the deckhands in making up the tow, and then went below when the Tug and Barge left on the voyage to Kingston, New York.

25. The NEW LONDON was taken in tow forward of the OCEAN PRINCE in push-tow fashion with the bow of the Tug snuggly secured in the Barge's stern notch with steel cables and several parts of synthetic lines. The overall length of both Vessels was about 385 feet, with steering and propulsion being supplied by the Tug. Both Vessels had a combined gross tonnage of 1,863. The Barge had a draft of about 12 feet. In its loaded condition, the Barge had only two feet freeboard and the view ahead from the Tug's pilothouse was unobstructed.

26. John Kiernan was in charge of the navigation during the first leg of the voyage which commenced at 1915 hours. At 2330 hours, Mate Walter Reimer came to the pilothouse of the Tug and relieved Captain Kiernan of the watch. Kiernan remained with Reimer for about 15 minutes, and then retired without any discussion of navigation on the river. The Tug and her Tow were approaching Haverstraw, New York at the time. The Tug, with Reimer now in charge of navigation, continued the trip northbound past Peekskill, New York and through Bear Mountain Bridge. At about this time, Reimer sent his deckhand to the galley to get coffee, leaving Reimer alone in the wheelhouse.

Reimer did not ask Kiernan to stand the watch with him, although Kiernan would have if asked. This is customary practice aboard towboats. At all relevant times the tide was ebbing, there was ice in the river, and visibility was two miles with snow flurries. The Tug was making good a speed of about 6 knots over the bottom (the Vessels were proceeding against the current). At this time the Tug's radar was operating and in use. A navigation chart for the area was open and in use. Reimer was able to see both shorelines of the river to port and starboard and was also able to see over the full length of the Barge and a safe distance ahead. He was using his radar from time to time to confirm his visual sightings and to locate aids to navigation and other points of reference ahead. At all times the Tug's radar, steering system and engine controls were operating properly.

27. Reimer had not attended any navigation school and never had any formal training in the use of the radar, but was familiar with its operation.

28. The river north of the Bear Mountain Bridge is bounded on both sides by mountains. There was ice flowing on the river with heavy accumulations along parts of the shorelines.

Dead ahead of the Bear Mountain Bridge, west of the navigable channel, approximately one and three-quarter miles north of the Bridge is an obstruction consisting of a pinnacle rock or rocky area, the apex of which is 7 feet below the mean low water line and not visible to vessels in navigation. It is located east of a wide shoal area along the west shore which also is not visible from

the surface. The rock obstruction and shoal area west of it projects almost 400 yards into the river from its westerly shore.

About 600 to 800 yards north of the rock is lighted beacon # 27 located on the easterly shore of Con Hook Island. The light is 46 feet above the water according to the Light List and is visible to a tug from the town of Manitou about 1.3 miles south.

The River is 800 yards wide off Mystery Point, and narrows to 450 yards off Con Hook Island. The channel east of the rock described above, which is located between Mystery Point and Con Hook Island, is about 500 yards wide. The river depth in this area varies between 35 feet and 127 feet.

29. The rock presents a dangerous hazard and obstruction to navigators in the Hudson River, apparent on the chart and well known to mariners familiar with the waters and to the Coast Guard.

30. The obstruction is marked by the "25" lighted buoy, which was established and is maintained and operated by the Coast Guard for the purpose of marking the rocky obstruction near the channel. The buoy also marks the westerly extreme of the navigable channel and a bend in the river. The "25" light buoy is replaced by the Coast Guard annually in December at the commencement of the ice season by an unlighted, second class black can buoy. The can buoy was in use on February 3, 1974. This change is noted in the Light List.

31. Reimer knew of the existence of the buoy on the chart and the obstruction it designated.

32. As the Tug and her Tow passed abeam Mystery Point, Reimer did not locate the "25" can buoy either visually or on the radar. Because the said buoy marks a dangerous obstruction as well as a bend in the channel, Reimer reduced engine speed, turned on the Tug's powerful spotlight to illuminate the area ahead, and continued to search for the buoy visually and by radar.

33. Shortly afterwards, at about 0130 on February 3, 1974, the Barge struck the rock on its port bow resulting in damage to the Barge's forepeak and # 1 and 2 port side cargo compartments. After impact, Reimer sighted the buoy to the starboard partially visible in the ice near the Vessel's wake. He assumed that the Barge and the Tug in making the turn to starboard after the incident had freed the buoy from the ice.

34. The buoy was obscured by ice and was not seen by Reimer as the Tug and Tow approached it. The ice flow and ice accumulation along the shorelines including north of Mystery Point on the easterly shore partially obscured the image of the shoreline both to the eye and on radar.

35. Immediately after the casualty Kiernan was summoned and return to the pilothouse. He saw the lighted tower of Con Hook Island ahead and the "25" black can buoy about 50–75 feet off the starboard beam of the Tug. The Vessels were still on a northerly heading at the time. After turning around, the lights on the Bear Mountain Bridge about 2 miles south of the Tug's position were also visible. Kiernan brought the Tug and Barge to the Day Line Pier south of the casualty site where they remained until the NEW LONDON was partially lightened into another barge later in the day.

36. The grounding of the Barge NEW LONDON resulted, in part, from Reimer's lack of knowledge of local landmarks and experience on the Hudson River.

37. Reimer did not examine the Light List or the Coast Pilot very carefully because he was unfamiliar with the warning therein not to rely solely on buoys and the warning that ice covers the buoys in this area during the winter.

38. Reimer failed to post a lookout when conditions were such that same was required.

39. A navigator who is about to enter strange waters should familiarize himself with the applicable charts, the Light List and the Coast Pilot.

40. The Light List contains a number of warnings to the navigator including the following:

"It is imprudent for a navigator to rely on floating aids to navigation to always maintain their charted position and to constantly and unerringly display their advertised characteristics. The obstacles to perfect performance are of such magnitude that complete reliability is manifestly impossible to achieve. Buoys are liable to be carried away, shifted, capsized, or sunk as the result of storms, ice conditions, collisions, or other accidents.

\*   \*   \*   \*   \*   \*

"All buoys should, therefore, be regarded as warnings or guides and not as infallible navigation marks; especially those located in exposed positions. Whenever possible, a ship should be navigated by bearings or angles on fixed objects on shore and by soundings rather by reliance on buoys."

41. The Light List also states that the lighted buoy "25" (Aid, No. 1874) is "replaced by an unlighted can from Dec. 15 to April 1." It also shows that the fixed light No. 27 on Con Hook Island is on a black skeleton tower, the top of which is 46 feet above water.

42. With respect to the ice on the Hudson, the Coast Pilot states:

"The ice season usually starts in early January and ends in mid-March. Normally shipping is affected most seriously in the Hudson River between Tappan Zee and Albany. In addition to the problem of getting through the ice, aids to navigation are covered or dragged off station by moving ice. Buoys are removed from the Hudson River during the ice season then reset in late March when the ice clears. However, the river is well marked by lights along the shore." (p. 235).

43. The rock obstruction marked by the "25" can buoy is located in an area which is susceptible to ice accumulation on the ebb tide because an "eddy" is created south of Con Hook Island which results in ice build-up. On the ebb tide, ice accumulation north of Mystery Point on the east shore, directly across the channel from the rock, also occurs. These conditions are known to the Coast Guard and, on occasion, result in the obscuring of the buoy on the west and a distortion of the shoreline on the east.

44. With respect to Con Hook Island, the Coast Pilot makes the following observation:

"A rock, with a depth of 7 feet over it and marked by a lighted buoy, is about 0.3 mile southward of Con Hook. When descending the river, particularly with a fair current, there is a tendency to set toward the rock; caution is advised."

45. At no time prior to the grounding did Mate Reimer see the flashing light on Con Hook Island, north of the can buoy "25".

46. The proximate and predominate causes of the grounding were errors in navigation. These errors in turn were the result of an error in management, whereby a navigator inexperienced with the waters was given no assistance from an experienced navigator then on board in traversing a portion of the river that was dangerous under the circumstances then existing.

47. With proper use of radar, Reimer could have gotten a radar range from the Bear Mountain Bridge with reasonable accuracy. With a radar range off Bear Mountain Bridge and a visual bearing on Con Hook Light it would have been possible to construct a danger bearing to keep the Vessel off the rock. However, since the Tug, as most tugs, was not equipped with a gyro repeater or a pelorus it was difficult to take accurate visual bearings.

48. The obscuring of the buoy by ice contributed to the grounding in that if the buoy had been visible it would have indicated to Reimer he was off course and to the west of the channel.

49. The casualty involving the NEW LONDON was the third grounding at the same location involving similar circumstances during the prior 20 years. One year before the grounding of the NEW LONDON, on February 26, 1973, the loaded gasoline Barge GEORGE T. TILTON, while being push-towed by the Tug BART TURECAMO, struck the rock marked by the "25" black can buoy, causing damage to the

Barge and pollution. Coast Guard records show the buoy was reported to be under the ice at the time of the grounding.

50. In January, 1969, the Coast Guard Cutter SASSAFRASS went aground on the same rock due to a navigational error with the buoy in plain view.

51. In December, 1963, the Coast Guard Cutter SAUK went aground at the same location. In this case, it was reported to the Coast Guard that the can buoy in question was under the ice. In investigating the incident, the Coast Guard learned that several other casualties at the same rock preceded the SAUK grounding, although those incidents occurred in the 1920's and 1930's and the conditions existing therein were not developed.

52. Similarly, in January, 1976, the Barge ROBERT L. POLING, while in tow of the Tug JOAN MORAN went aground on the same rock. Coast Guard records show that the buoy was reported to be almost completely submerged under the ice at the time of the grounding.

53. During the following winter a major oil spill occurred at the same location, but the facts of that incident were not developed at trial.

54. The can buoy is the best practical floating aid for the site, available under present technology. A fixed tower on the rock, the base of which would be in 7 feet of water, would be damaged or destroyed by ice.

55. In light of the difficulty in keeping this floating aid to navigation visible during the winter season, there were available other navigational aids which could have been established on land which would better aid the mariner in staying in the channel.

56. The Coast Guard has not established any ranges or lights on the eastern shore in the immediate area approaching can buoy "25".

57. The Government publication of Waterborne Commerce of the United States shows the following with respect to the number of trips passing the Con Hook area:

Vessels and tug and barge flotillas travelling between Upper Bay, New York Harbor and Waterford, New York.

|  | Up Bound | Down Bound |
|---|---|---|
| 1971 | 70,586 | 73,081 |
| 1972 | 57,779 | 59,378 |
| 1973 | 61,741 | 62,468 |
| 1974 | 55,578 | 55,306 |
| Total 4 years | 245,684 | 250,233 |

Of these, 118,435 were up bound tug and barge flotillas and 166,133 were down bound tug and barge flotillas with drafts of 18 feet or less.

58. As a result of the NEW LONDON striking the rock, oil leaked from the Barge into the river. Notice of violation was given to Pittston on August 27, 1974; written response was submitted by Pittston and a hearing was held on September 26th; thereafter a civil penalty of $5,000.00 was assessed and notice of Pittston's right to appeal the penalty was given to Pittston. Pittston appealed the assessed penalty. The Commandant of the Coast Guard denied the appeal.

## OPINION

To summarize the major events giving rise to this litigation, on February 3, 1973, the barge New London, loaded with oil and in the tow of the Tug Ocean Prince, ran aground on a submerged rock formation in the Hudson River. The buoy, placed by the Coast Guard to mark the obstruction, was apparently obscured by ice. The impact caused the New London to leak oil, fouling the river. The Government undertook the cleanup operation. This sequence of events raises some difficult questions of maritime liability and novel issues of interpretation of the Water Quality Improvement Act of 1970.[1]

Tug Ocean Prince, Inc., as owner, and Red Star Towing & Transportation Company, as charterer of the Tug Ocean Prince,

---

1. 33 U.S.C.A. § 1151 *et seq.*, (Supp. 1977). It is conceded that all claims fall within the admiralty jurisdiction of this court, Fed.R.Civ.Proc. 9(h) and arise under 33 U.S.C.A. § 1321 (Supp. 1977) 46 U.S.C. § 183 *et seq.* and 46 U.S.C. § 742 (1970).

seek exoneration from liability on the ground that the accident was caused by the Government's failure to maintain adequate aids to navigation. (They are referred to hereafter simply as "Plaintiffs"). Alternatively, they seek to have their liability limited to the value of the tug, claiming that the grounding resulted from a cause outside their privity and knowledge. Claimant Pittston seeks to recover the value of all the oil lost from its barge either from the plaintiffs or from the Government. The Government seeks the substantial costs of the oil pollution cleanup from the other parties and a civil penalty from Pittston. Pittston, in turn, seeks indemnity from the plaintiffs for any liability it may have to the Government because of the oil spill.

The trial was bifurcated and issues concerning damages reserved for later consideration. The liability issues will be considered separately.

### Plaintiffs' Claim for Exoneration or Limitation of Liability

The grounding of the barge New London was caused by a grave error in navigation by the Mate, Reimer. Unfamiliar with the locale, deceived by ice build-up along the shore, he allowed the tow to stray to the west of the channel while he concentrated on attempting to locate a buoy which had apparently become obscured by drifting ice floes. His concentration on locating the buoy was ill advised in light of the fact, clearly set forth in the *Coast Pilot*, that buoys in this area (the Hudson River between Tappan Zee and Albany) get covered and moved off station at that time of year by moving ice. Even without the warning in the Coast Pilot, a mariner familiar with the river would not have relied on the buoy at this time of year under the existing conditions.

While the plaintiffs contend that the inability to locate the buoy was the proximate cause of the grounding, it is clear that the errors of navigation were the proximate cause. The obscured buoy was merely a "but for" factor which, had it been visible, might have corrected the navigational errors. It cannot be said, therefore, that inability to use the aid to navigation was the proximate cause of the incident. *American Smelting & Refining Co. v. S. S. Irish Spruce*, 548 F.2d 56 (2d Cir. 1977). Because the accident was not inevitable, but was instead due to negligence, plaintiffs are not entitled to exoneration from liability. *The Grace Girdler*, 74 U.S. 196, (7 Wall.) 441, 18 L.Ed. 790 (1868); *The Jumna*, 149 F. 171 (2d Cir. 1906). Whether the plaintiffs are entitled to indemnity from the Government under the Suits in Admiralty Act, 46 U.S.C. §§ 741–52, because of its failure to provide a more reliable aid to navigation, will be considered subsequently.

Having concluded that plaintiffs are not entitled to exoneration from liability, we turn to the related question of whether plaintiffs are nevertheless entitled to limit their liability pursuant to the Limitation of Liability Act, 46 U.S.C. § 183 *et seq.*

The operation of tug boats differs in several material respects from that of ocean going vessels. Because tugs are kept in operation so steadily and the watch standers work such long hours (twelve a day) it is necessary to have two complete sets of crews, changing every two weeks, as well as alternates for vacation periods. The crew ordinarily includes two watchstanders, a Captain and a Mate, who alternate six hour watches. While on watch they usually not only command and navigate the tug but also serve as helmsmen "steering" the vessel. Necessarily this limits the amount of instrument navigation and plotting of position possible. For this reason such tugs are not usually equipped with gyro repeaters or peloruses for taking positions. Navigation is done by sight of eye, piloting from known landmarks and aids to navigation. Consequently, intimate familiarity with the waters and hazards is far more important than in ocean navigation. An unfamiliar helmsman requires assistance from an experienced one. It is the responsibility of the Captain to see that the inexperienced navigator (who could be himself) gets such assistance. This responsibility, along with certain administrative chores, is one of the

few distinguishing factors between the duties of a Captain and those of a Mate.

Plaintiffs appreciated this factor in assigning a crew to the Ocean Prince, but an unfortunate set of circumstances created unforeseen confusion relating to which of the watchstanders was to assume the position of Captain. Much of the uncertainty stemmed from the fact that Reimer, one of the watchstanders on the night in question, had been a regular pilothouse watch stander aboard the Ocean Prince. He had served as both Mate and Captain when the vessel was stationed in the South. After Reimer had left for an extended vacation, the vessel was brought to New York. Reimer had no experience in piloting the Hudson.

The day before Reimer returned to the Ocean Prince, the Mate then aboard took leave. Needing an experienced man, plaintiffs called upon an associated company to supply a suitable person. It sent John Kiernan, a tugboat captain with 30 years experience on the Hudson River. When Kiernan came aboard on February 1, 1974, the preceding Captain was still there, so Kiernan started as Mate. The next day Reimer rejoined the vessel and the Captain left. Kiernan knew that Reimer was a full-time employee of plaintiff, regularly assigned to the vessel, and qualified to act as its Captain. He did not know that Reimer had not been aboard the vessel during the couple of months it had been operating on the Hudson or that he had *never* navigated the Hudson on any vessel.

The vessel commenced the voyage in question shortly after Reimer came on board and, during the half day preceding the grounding, the two had only two brief discussions. Kiernan contends that, since he was only a replacement, and it was Reimer's regular vessel, he believed Reimer was the Captain. Kiernan, however, occupied the Captain's cabin, stood the watch traditionally taken by the Captain and performed certain administrative tasks which were the Captain's responsibility. (Kiernan maintains that he was forced to assume these tasks after the grounding due to

Reimer's extremely upset emotional state.) While Kiernan vaguely claims he alerted Reimer when the watch changed to the general navigational situation ahead, his testimony in this regard was not credible, particularly in light of his professed lack of knowledge of Reimer's unfamiliarity with the river.

It remains a mystery why Reimer did not seek assistance as navigation became progressively more difficult due to the treacherous river conditions. (The issue could not be explored because Reimer, who is no longer in plaintiffs' employ, was beyond the subpoena power of the court and did not testify at trial.) His evidence was offered through two lengthy depositions, but in neither of these did any of the counsel explore his motivation in proceeding alone at night up a strong ice-choked river, while aware that he was not picking up the next aid to navigation along the route. One possible answer lies in his having sent his deckhand down to the galley to make coffee prior to the grounding. (He returned, apparently just about the moment of the grounding.) Had the deckhand been available, he could have taken the wheel while a radar range was taken, or been sent forward as a lookout, or, as the best course, been sent to get Kiernan out of his bunk. Had Kiernan been brought to the wheel house, it is very likely he would have quickly detected that they were to the west of the channel and that the buoy was obscured by drifting ice. The question remains whether Reimer's error in judgment is attributable to plaintiff. If so, it is a factor within plaintiff's "privity or knowledge" and a ground for denying limitation of liability under the Limitation of Liability Act, 46 U.S.C. § 183 *et seq.*

*Limitation of Liability*

The claimant and the Government maintain that limitation should be denied because Reimer's inexperience rendered the vessel unseaworthy. They contend that plaintiff's failure to post a lookout violated Title 33 U.S.C. § 221. They also claim that plaintiffs had failed to provide proper charts aboard the tug. These contentions will be discussed in order.

The burden is clearly upon plaintiffs, in a proceeding under Title 46 U.S.C. § 183, to establish their own lack of privity or knowledge in order to limit their liability. *Coryell v. Phipps*, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943). In *Spencer Kellogg & Sons, Inc. v. Hicks*, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932), the Supreme Court, while denying limitation in that case, nevertheless distinguished situations in which an "emergency must be met by the master alone. In these there is no opportunity of consultation or cooperation or of bringing the proposed action of the master to the owner's knowledge. The latter must rely upon the master's obeying rules and using reasonable judgment." *Id.* at 511–12, 52 S.Ct. at 453. Plaintiffs claim that the collision at issue here presented just such an emergency and contend that it is questionable whether there were any preventative measures which could have been taken to avoid the accident.

Claimants and the Government maintain that Reimer's general unfamiliarity with the Hudson, rather than a specific error of navigational judgment, was the direct cause of the accident. Following this line of argument, they contend that his inexperience created a condition of unseaworthiness which was within the privity and knowledge of plaintiffs. While this view finds support in a nineteenth century case, *The Lady Pike*, 88 U.S. 1, 21 Wall. 1, 22 L.Ed. 499 (1874), modern authority has rejected it. In *The Temple Bar*, 137 F.2d 293 (4th Cir. 1943) the court stated:

> "[T]he decision [*The Lady Pike*] cannot be accepted as authority for the broad proposition that it is negligent to put a master in charge of a ship, whatever the voyage, unless he is familiar with all the local conditions he may be expected to encounter. If, as in the case at bar, a master, qualified in other respects, is placed in command, and if he is supplied with charts and publications sufficient to enable a competent man safely to navigate the ship, it is not necessary that he should have prior knowledge of local conditions; and lack of it will not cause the ship to be unseaworthy."

*Id.* at 297.

It is clear that the court did not base its finding of the Master's competence on his familiarity with the assigned route. The court required, instead, that the Master be qualified in other respects (not specified) and that owner stock the ship with relevant charts and navigational publications.

Plaintiffs maintain that they have fulfilled these conditions. Reimer is a licensed tug captain with several years' experience in tugboats. He had available charts and publications which clearly designated the location of the submerged rocks. Moreover, he was clearly aware of the hazard because he had been searching for the can buoy for a substantial period prior to the grounding. A failure to perceive the hazard might have been indicative of generalized incompetence which would have created an unseaworthy condition. An inadequate response to a known danger presents an error in navigational judgment and, as such, falls outside the owner's privity and knowledge. As stated by a definitive treatise in the field:

> "The navigation of the vessel is under the absolute control of her master . . . and no case has been found where a shipowner, individual or corporate, has been denied limitation because of a liability arising out of an error of management or of navigation on a voyage committed by an employee whom the owner was warranted in believing to be competent with knowledge of his duties."

3 *Benedict on Admiralty* § 42 at 5–25 (6th ed. 1975).

Defendant also argues that plaintiffs failed to provide proper charts aboard the tug. Reimer denied this assertion in his depositions and claimed that he had referred to both a chart of the Hudson which designated the location of the rock and the Coastal Pilot and Light List. The Coastal Pilot and Light List state that during the winter, can buoys become submerged in the ice and cannot be seen. It appears that Reimer was *not* aware of this condition. But this was due to his own negligence in

not referring to the manual, rather than the owner's negligence in not providing it. Since the materials were on board, it is clear that the owner's duty was satisfied. The question is whether the equipment on board was "reasonably fit under the circumstances":

"Neither the absence of an additional watch officer nor the location of the rudder angle indicator involved negligence or rendered the vessel unseaworthy. Although the presence of an additional officer or the relocation of the indicator might have reduced the possibility of collision, that is not the standard by which we are to determine whether Farrell [the owner] is entitled to limitation. Rather, we must ask whether the procedures and equipment utilized rendered the vessel *reasonably* fit under the circumstances. . . . the vessel as equipped was reasonably capable of performing the intended mission *if properly operated. The accident resulted from lack of care and failure to exercise proper procedures by those on the bridge.* For this Farrell is liable, but it is also entitled to limit." (emphasis added; footnote omitted.)

*Farrell Lines, Inc. v. Jones,* 530 F.2d 7 (5th Cir. 1976) at 12–13. *See also United States v. Sandra & Dennis Fishing Corp.,* 372 F.2d 189 (1st Cir. 1967).

Defendants also contend that there existed a violation of Title 33 U.S.C. § 221 which provides in pertinent part:

"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of . . . any neglect to keep a proper lookout . . . ."

Mate Reimer was alone in the wheelhouse at the time of the casualty since he had sent the deckhand, Hebert, below to make coffee.

The parties appear to have assumed, with some support from precedent (*see Dwyer Oil Transport Co. v. The Edna M. Matton,* 255 F.2d 380 (2d Cir. 1958); *The Supply No. 4 (The Dalzellea),* 109 F.2d 101 (2d Cir. 1940)) that there is no compliance with the statute where a tug master simultaneously serves as a lookout. It seems somewhat unreasonable to require a small vessel running in uncongested waters to maintain both a pilot and a lookout at all times. In fact, one court in a case involving a tugboat stated that the rule requiring a separate lookout was limited to large vessels. In other instances, a court should weigh "the size of the vessel and the opportunity of the navigator to have a full view of the sea." *Anthony v. International Paper Co.,* 289 F.2d 574, 580 (4th Cir. 1961). It is unclear whether the law of this Circuit requires a tug to have a lookout at all times or only when conditions of navigation require it. *Poling Russell, Inc. v. United States,* 196 F.2d 939 (2d Cir. 1952).

■ Assuming, arguendo, that the law of this Circuit requires the posting of a separate lookout on a tug at all times, a violation would then be established and the *Pennsylvania* rule, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148 (1874) would come into play with the effect that the owner must prove that the violation could not have contributed to the casualty in any way. *See Ira S. Bushey & Sons v. United States,* 172 F.2d 447 (2d Cir. 1949). This is not, however, an unbearable burden. *Dwyer Oil Transport Co. v. The Edna M. Matton, supra* at 382; *National Bulk Carrier v. United States,* 183 F.2d 405 (2d Cir.), *cert. denied,* 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631 (1950).

■ There was no proof whatever that a lookout forward could have observed the ice stranded buoy. The buoy, according to the evidence, was not visible until freed from the ice by the wake of the passing tug. Indeed, as indicated earlier, had the deckhand been in the wheelhouse, he would have been more useful taking the wheel and freeing Reimer to either take navigational fixes or call Kiernan, the experienced pilot. Therefore, the failure to post a lookout cannot be said to have contributed to the collision.

■ Finally, we have the question concerning the plaintiffs' responsibility for the alleged confusion as to who was to be the Captain of the vessel. Kiernan testified

that had he known he was the Captain, he would have assured himself that Reimer was familiar with the river before allowing him to take the wheel under the conditions. Again, errors in management aboard the vessel may not be imputed to the owners so as to deny limitation. *South Carolina Highway Dep't v. Jacksonville Shipyards, Inc.,* 1976 A.M.C. 456 (S.D.Ga.1975); *see also New York Marine No. 10, (The C. F. Coughlin),* 109 F.2d 564, 565 (2d Cir. 1940); *Petition of Tracy,* 194 F.2d 362, 363 (2d Cir. 1952).

■ It is argued that the failure to make the chain of command apparent prior to departure was an error by the managing officers of the corporation and, consequently, within the owner's privity and knowledge. *Craig v. Continental Ins. Co.,* 141 U.S. 638, 12 S.Ct. 97, 35 L.Ed. 886 (1891). But without regard to whether he acted in the capacity of Captain or Mate, Reimer was well aware that he was unprepared to navigate under the difficult conditions which were rapidly developing. Kiernan was quite emphatic that he was willing to render assistance to Reimer whether he was Captain or Mate. Therefore, it was Reimer's failure to seek assistance, more than Kiernan's failure to offer it, that caused the accident. Reimer's failure in this regard is similar to the neglect of an otherwise competent officer to consult available charts and aids to navigation—an event which is not an unseaworthy condition for which the owner is responsible. *California and Hawaiian Sugar Co. v. Columbia S. S. Co.,* 391 F.Supp. 894 (E.D.La.1972), *aff'd,* 510 F.2d 542 (5th Cir. 1975). Plaintiffs are, therefore, entitled to limit their liability.

### Governmental Responsibility for the Grounding

We turn now to the plaintiff's contention that the Government's negligence in maintaining the aids to navigation in the area of the grounding was a factor in the grounding and, therefore, the Government should be found liable for negligence under the Suits in Admiralty Act, 46 U.S.C. §§ 741–52.

In *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Supreme Court recognized that liability under the Federal Tort Claims Act extended to the Coast Guard's failure to adequately maintain a lighthouse. Contrasting nonfeasance and misfeasance, the Court held that, while the Coast Guard had no obligation to supply lighthouse services, once it exercised its discretion by electing to do so, it must use due care. Consequently, the Coast Guard was under a duty to maintain the equipment and to warn mariners in the event the lighthouse became inoperative.

*Indian Towing* was applied to the placement and maintenance of buoys by this court in *Afran Transport Co. v. United States,* 309 F.Supp. 650 (S.D.N.Y.1969), *aff'd,* 435 F.2d 213 (2d Cir. 1970), *cert. denied,* 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116 (1971). In that case, damages were sought following the grounding of an oil tanker on a reef caused by a marker buoy having drifted out of position. Again, while the decision to erect a navigational aid lay within the Coast Guard's discretion, having acted, the Coast Guard was required to act with due care.

■ Thus *Indian Towing* imposes a dual responsibility upon the Coast Guard, once it has decided to locate an aid to navigation in a waterway. First, the Coast Guard must use due care to see that the aid is properly maintained and operated. Secondly, should an aid become inoperative the Coast Guard has an additional duty to warn mariners of the absence of the expected aid. Merely warning mariners of a perilous condition, as a rule, will not absolve the Coast Guard of the duty to correct a dangerous condition, but adequate warnings may absolve them from a particular liability. *Compare Greer v. United States,* 505 F.2d 90 (5th Cir. 1974) *with De Bardeleben Marine Corp. v. United States,* 451 F.2d 140 (5th Cir. 1971).

■ In the instant case, the Coast Guard was confronted with submerged rocks at the periphery of the Hudson River channel relatively close to another aid to navigation

(Con Hook Light). This area had a good safety record during most of the year while the lighted aid was in use. At the time of the Ocean Prince grounding, the buoy was in position, although obscured by ice. Applying *Indian Towing* to these facts, the Coast Guard had the duty to maintain the buoy or to warn of any interruption of service. The evidence demonstrates that the Coast Guard, in the Coast Pilot, warned mariners of the possibility of ice obstructing buoys *in this particular* span of waterway and, additionally, the "Notice to Mariners" for the week of the accident made particular mention of the problem of ice covered buoys in that area. Absent a showing that the Coast Guard had notice of ice covering this particular buoy during the day in question (and could have repaired it), the Court is not persuaded that the Coast Guard was negligent in its servicing of the buoy.

The Coast Guard had determined (and the evidence supported its conclusion) that during the winter months a can buoy was the most effective floating aid to navigation available. The large, lighted buoy not only was more vulnerable to flow ice, but was also subject to the added danger that the light would be broken, thereby extinguishing the expected aid. The plaintiff does not strenuously challenge this but argues, instead, that the problems of maintaining the buoy ice free and the dangers of the location, warranted the installation of different forms of aids to navigation, either constructed on man-made islands or shore-based range lights.

In considering the dangers of the location, some evidence was admitted concerning accidents at the site during the prior thirty years, as well as two groundings (one of which resulted in a severe ecological disaster) occurring in the following couple of years.

■ Courts have generally recognized that evidence of a *prior* similar accident has some tendency to establish a dangerous or defective condition at the place in question. *Hayes v. Lane Construction Corp.*, 260 F.2d 279 (2d Cir. 1958) (applying New York law); *Balchunas v. Palmer*, 151 F.2d 842 (2d Cir. 1945) (applying Conn. law). Such evidence draws its relevance from the principle that similar causes can be expected to produce similar effects, so that admissibility hinges upon a demonstration that the conditions had been substantially similar on all occasions. *Hayes, supra; Balchunas, supra; Knight v. Baltimore & Ohio R.R. Co.,* 8 F.R.D. 261 (S.D.N.Y.1948).

Judge Weinstein, in his treatise on evidence, does not distinguish between prior and subsequent accidents, but states generally that

"[e]vidence of other accidents in the same place or involving the same machinery or instrumentality is generally admissible, not because it shows that defendant has a general tendency to be negligent, but because it tends to prove either (1) the existence of a dangerous or defective condition where this is in issue or (2) that defendant knew or should have known of the dangerous or defective condition.

"The requisite similarity of accidents depends on what the evidence is designed to prove:

'If the proof of other accidents is offered to establish the dangerous condition, logic would require similarity of hazard. But if offered to prove notice of danger, the requisite is the warning quality of the other accident. Thus evidence of a previous accident at the place, unknown to the owner defendant, would be irrelevant to prove notice of the danger, but it may be relevant to prove the dangerous condition of the place. Likewise, evidence that is unnecessary to prove dangerous condition may be logically relevant to prove the notice of the hazard. Of course as the circumstances of other accidents are more similar to the one in question, the probative value of such evidence for either or both purposes is likely to be greater.'" 2 J. Weinstein & M. Berger, Weinstein's Evidence § 404[11] at 404–76 (1976), citing, Trautman, "Logical or Legal Relevancy—A Conflict in Theory," 5 Vand.L.Rev. 385, 402 (1952).

While the subsequent disasters have emphasized the navigational hazard in this area, we must evaluate the reasonableness of the Coast Guard's decisions on the basis of facts available at the time of the grounding. Prior thereto, and over a period of thirty or so years, despite an extremely heavy volume of traffic, there had only been two groundings under similar circumstances. (One of them, to the mortification of the Coast Guard, involved the Cutter Sauk in 1963. Another cutter, in completely dissimilar circumstances, ran aground in 1969—causing the reef to be known locally as "Coast Guard Rock".)

Although, at the time of the accident the location was not considered to have a high priority among Hudson River sites needing additional aids to navigation, some consideration was given to the situation by the Coast Guard's officials. Evidence as to the cost and feasibility of aids to navigation other than a buoy at this location persuades the Court that the Coast Guard used due care in its decision to mark the reef in the winter of 1974 with a black can buoy. The Coast Guard weighed the need for some other aid to navigation against the costs of various fixed lights, constructions on the pinnacle or its demolition. It also considered the ecological problems in establishing shore based aids, the priority needs of other, more dangerous, locations and the funds available.

In the absence of showing that a can buoy was so ineffective that its choice constituted negligence *per se*, the Coast Guard should not be divested of its executive discretion to choose such aids to navigation as will most effectively and efficiently function within its fixed budgetary limitations. In so concluding, it must be stressed that this evaluation is limited to the history of the hazard in 1974. The Coast Guard's liability for the subsequent groundings, and the wisdom of erecting different types of aids to navigation at this time, are issues not before this Court.

There is a further reason for refusing to find the Coast Guard liable for this accident. Reimer had available for navigational purposes both radar, which could take bearings and ranges on prominent objects (such as Bear Mountain Bridge) and the Con Hook Light, on which a visual bearing could have been taken. Nevertheless, he strayed west of the channel looking for an obscured buoy. The premise that the presence of additional aids might have assisted in correcting his navigational error would be a

"fortuity [having] nothing to do with proximate cause. Liability must rest on causal relationship between the negligent aspect of the conduct and the harm resulting from the conduct."

*American Smelting and Refining Co. v. S.S. Irish Spruce*, 548 F.2d 56, 60 (2d Cir. 1977).

It cannot be said, therefore, that the negligence, if any, of the Government in not establishing more effective aids to navigation was the proximate cause of the grounding.

### The Amount of Plaintiff's Liability Under the Water Quality Improvement Act

The Water Quality Improvement Act of 1970, as amended by the Federal Water Pollution Control Amendments of 1972, was passed by Congress in the wake of two disastrous oil spills: the running aground of the tanker, Torrey Canyon, off the coast of England in 1967 and the Santa Barbara drilling disaster in 1969. The primary purpose of the new legislation was to permit the Government to collect cleanup costs directly from the polluter. To effect this goal, the Act provided, in Section 102(f)(1) of the Water Quality Improvement Act of 1970, later codified at 33 U.S.C.A. § 1321(f)(1) (Supp.1977) that:

"Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) *an act or omission of a third party without regard to whether any such act or omission was or was not negligent*, or any combination of the foregoing clauses, such owner or operator of any vessel from which oil or a hazardous substance is discharged . . .

shall . . . be liable to the United States Government for the actual costs incurred . . . in an *amount not to exceed $100 per gross ton of such vessel or $14,000,000*, whichever is lesser, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs." (emphasis added).

In other words, the owner or operator of a vessel which discharges oil can limit its liability, provided the government cannot show willful negligence or misconduct.

The legislative history indicates that conflicting policies resulted in both the limitation amount and the willful negligence standard for breaking the limitation. The Senate bill, as introduced, would have imposed liability only if negligence were shown. The original limitation amount was the lesser of $450 per gross ton or $15 million. The $450 amount was based upon the estimated cleanup cost of one ton of oil. Later evidence indicated that while this figure reflected an accurate, cleanup estimate, it was improbable that any vessel would discharge its entire cargo. The $100 figure was thereafter substituted to approximate actual, anticipated costs. S.Rep.No. 91–351 at 4, 91st Cong., 1st Sess. (1969), 3 E.P.A. Legal Compilation (Water) at 1327.

■ While the limitation amount appears to reflect actual cleanup costs, this goal is not realized where a third party causes the oil spillage. Section 102(g), 33 U.S.C.A. § 1321(g) (Supp.1977) controls third party liability and provides that subject to the same defenses provided in Section 102(f)(1), a third party which causes an oil spill will be liable instead of the owner or operator of the spilling vessel. This section also contains a limitation of liability, and further distinguishes situations where the third party is the owner or operator of a *vessel* from other third party situations. Where the third party *is* an owner or operator of a vessel "the liability of such third

party . . . shall not exceed $100 per gross ton *of such vessel* or $14,000,000, whichever is the lesser." (emphasis added). The section goes on to provide that where the third party causing the spillage is not an owner or operator of a vessel, its liability "shall not exceed the limitation which would have been applicable to the *owner or operator of the vessel . . . from which the discharge actually occurred.*" (emphasis added). Clearly this represents a conscious legislative choice to inject traditional admiralty concepts into the limitation calculation by limiting a third party vessel owner's liability with reference to *his* vessel rather than the vessel which actually spilled the oil. Obviously, once the limitation is calculated with reference to a vessel other than that which spilled the oil, the correlation between vessel gross tonnage and actual cleanup costs is destroyed.

■ The legislative history indicates that the drafters, in providing the third party defense, envisioned a situation where the third party vessel *collides* with an oil-carrying vessel. S.Rep.No. 91–351 at 5, 91st Cong., 1st Sess. (1969), 3 E.P.A. Legal Compilation (Water) at 1329. The available legislative materials provide no clue as to whether the drafters ever considered the situation presented where a substantially smaller vessel either collides with or, as presented here, negligently causes the oil spillage. It is inconceivable that Congress was unaware that much of the oil moving on inland waterways is carried by barges and that the tugs pushing them are often owned by third parties. Faced with the clear choice to limit a third party's liability with reference to the gross tonnage of a vessel not spilling the oil, the Court must construe the section in accordance with the clear import of its terms, even if the effect would seem contrary to the general legislative intent. Where statutory language is clear and unequivocal, there is no occasion for the Court to resort to interpretive aids. *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); *Arkansas Valley Industries, Inc. v. Freeman*, 415 F.2d 713, 717 (8th Cir. 1969).

In the face of unequivocal statutory language and the absence of conflicting legislative history, the Government nevertheless contends that the "flotilla rule" should apply. Application of this rule would result in the calculation of the limitation amount by reference to the combined gross tonnage of the tug and the barge. While no authority has been submitted concerning the application of the rule in the statutory context presented here, it has been applied in traditional admiralty petitions for exoneration or limitation of liability. The Supreme Court in *Sacramento Nav. Co. v. Salz*, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663 (1927) required surrender not only of a barge but also of the steamboat towing the barge in an action by the owners of the barge's cargo. In a later case, *Standard Dredging Co. v. Kristiansen*, 67 F.2d 548, 550 (2d Cir. 1933), the Second Circuit interpreted the flotilla rule to permit recognition of a tug and barge as a single vessel where they are "owned in common and engaged in a common enterprise." Thus, the rule which emerged, as the Government concedes, is that where there exists a contractual or other obligation running from the petitioner for limitation to the claimant and a flotilla of commonly owned vessels was used to fulfill the obligation, the flotilla is regarded as one vessel for calculating the limitation fund.

The Tug Ocean Prince and the barge were not owned by the same entity nor is there any vestige of a contractual relationship running between the owners of either of these two vessels and the Government. Consequently, the flotilla rule, as traditionally stated, would be inapplicable to the facts of this case. The Government, conceding this much, would have this Court break new ground, and apply a mutation of the rule to flesh out the terms of the statute. As the discussion of the language and history of the statute indicates, the provision limiting the liability of third party vessel owners to the value of their vessel is unambiguous. The Court cannot substitute its notions of proper legislative goals for those adopted by Congress. *Arkansas Valley Industries, Inc. v. Freeman, supra.*

### The Amount of the Penalty To be Assessed Against Pittston

The penalty provision added by the Federal Water Pollution Control Act Amendments of 1972, codified at 33 U.S.C. § 1321(b)(6) (Supp.1977) reads in pertinent part:

"Any owner or operator of any vessel . . . from which oil . . . is discharged . . . shall be assessed a civil penalty . . . of not more than $5000 for each offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge. . . . ."

A civil penalty in the amount of $5,000 was assessed against Pittston after a hearing before a Coast Guard hearing examiner. Pittston had refused to pay the penalty on the authority of the federal district court holding in *United States v. LeBeouf Bros. Towing Co.*, 377 F.Supp. 558 (E.D.La.1974). The lower court had held that the penalty provided by 33 U.S.C.A. § 1321(b)(6) (Supp. 1977) was criminal in nature and could not be imposed except in a criminal proceeding which afforded adequate protections for Fifth and Sixth amendment rights. This holding was thereafter reversed on appeal, 537 F.2d 149 (5th Cir. 1976) and a petition for *certiorari* has been denied, 430 U.S. 987, 97 S.Ct. 1688, 52 L.Ed.2d 383 (1977). With the exception of this single, lower court holding, courts appear to be unanimous in finding the penalty civil. *United States v. General Motors Corp.*, 403 F.Supp. 1151 (D.Conn.1975); *United States v. Eureka Pipeline Co.*, 401 F.Supp. 934 (N.D.W.Va. 1975); *United States v. Independent Bulk Transport, Inc.*, 394 F.Supp. 1319 (S.D.N.Y. 1975); *United States v. W. B. Enterprises, Inc.*, 378 F.Supp. 420 (S.D.N.Y.1974).

The penalty provision at issue holds the owner or operator of a vessel strictly liable for the penalty, following a hearing at which normal due process safeguards are extended. Section 1321(b)(6) provides that "[i]n determining the amount of the penalty

. . . the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered . . . ."

The Coast Guard has stated its interpretation of these standards in "Coast Guard Policy for the Application of Civil Penalties Under Section 311(b)(6), FWPCA," which was printed as an appendix to the lower court decision in *United States v. LeBeouf Bros. Towing Co., supra*, at 569–70. While the statute does not explicitly include the degree of the actor's culpability as a factor in assessing the amount of the fine, the Coast Guard policy statement emphasizes that "[a] number of considerations may be made in determining the gravity of a violation, such as the *degree of culpability associated with the violation*, the prior record of the responsible party, and the amount of oil discharged. Substantial intentional discharges should result in severe penalties, as should cases of gross negligence, and so on. This is not to suggest that other considerations may not combine to determine the gravity of a violation." *Id.* at 569 (emphasis added).

In this context, it is valuable to note that while the 1972 amendments make no reference to culpability as a prerequisite for a substantial fine,[2] the predecessor of this penalty did. Section 11(b) of the Water Quality Improvement Act of 1970, Pub. L.No. 91–224, previously codified at 33 U.S.C. § 1161(b)(5), provided for a maximum fine of $10,000 for "knowing" discharges. The 1966 amendments to the Oil Pollution Act of 1924 created liability when a discharge resulted from a "grossly negligent or willful act." *Note, Liability for Oil Pollution Cleanup and the Water Quality Improvement Act of 1970*, 55 Cornell L.Rev. 973 (1970).

Thus, while the section does not expressly require culpable behavior, prior legislation and the Coast Guard interpretive standards for implementing the penalty all make reference to some element of negligent or knowing conduct prior to the imposition of a substantial penalty. The Government contends that the maximum fine should be assessed against Pittston on the sole basis of the "gravity of the violation," without any consideration of the degree of Pittston's culpability. The Government further argues that, while third party causation does not provide a defense to imposition of the penalty, it does provide a basis for indemnity.

The only case disclosed by our research where the third party's responsibility is discussed is *United States v. General Motors Corp.*, 403 F.Supp. 1151 (D.Conn.1975). In that case, vandals opened the valves of several of defendant's oil storage tanks causing oil to flow into a nearby river. In an extended analysis of the history and purpose of the penalty, Judge Clarie found that while third party causation did not constitute a defense, defendant's lack of culpability would require reduction of the penalty to the nominal sum of one dollar.[3]

Of course, the present case differs from *General Motors* in that the purportedly culpable party, The Tug Ocean Prince, is before the Court. There are three possible responses to this situation, in that the Court could: 1) obviate the need for indemnity by reducing the fine to a nominal sum; 2) following the Coast Guard's procedure and assess the entire fine against Pittston while recognizing a right to indemnity; 3) assess the fine against the allegedly culpable party, The Tug Ocean Prince. The first course would follow the only authority on point.

2. The Senate bill provided for assessment of the penalty where the government could show that the owner or operator acted "wilfully or negligently." S.Rep. 92–414, 92nd Cong., 2d Sess., *reprinted in* [1972] U.S.Code & Ad.News 3732.

3. The parties had stipulated that the proceedings before Judge Clarie should proceed as a trial *de novo*, and therefore the judge indicated that it was appropriate "to consider whether the sanction imposed by the administrative agency conforms to the facts brought out at the trial." The court found that the Coast Guard's finding that defendants were negligent deviated from the facts.

The second alternative requires more discussion.

Section 1321 does provide generally for indemnity by stating that:

"The liabilities established by this section shall in no way affect any rights which (1) the owner or operator of a vessel . . . may have against any third party whose acts may in any way have caused or contributed to such discharge. . . ."

33 U.S.C.A. § 1321(h) (Supp.1977). The issue then becomes whether the penalty imposed by Section 1321(b)(6) is a "liability" so as to provide a basis for indemnity. The parties draw support for their indemnity theory by pointing to the penalty provided in 33 U.S.C.A. § 1321(b)(2)(B)(iii) (Supp. 1977) which imposes a "penalty" in lieu of cleanup costs where it is impossible to remove a hazardous substance from the water. This penalty, unlike that of Section 1321(b)(6), is denominated a "liability" and is subject to the defense of third party causation.

Clearly, no indemnity could have been sought had the penalty been construed as criminal, intended to punish the actor. The weight of current authority, discussed above, has concluded that this particular penalty is civil and, therefore, the claimed right to indemnity is at least tenable. However, the penalty imposed in lieu of clean-up costs correlates not to the penalty provision at issue here, but rather to the Government's action for the actual costs of clean-up. Both of these actions recognize the third party defense, and, thereby, implicitly provide a ground for indemnity. The absence of a third party defense in this penalty provision, the language of the statutes, and the purposes of the various remedies supplied to the Government, lead to the conclusion that no indemnity right was contemplated for the penalty imposed by Section 1321(b)(6), even though it is civil in nature.

Finally, the Government urges that the "flotilla rule" should apply not only to determine the correct limitation amount but also the possible imposition of the fine on the third party, Tug Ocean Prince. Both the penalty provision, Section 1321(b)(6), and the provision governing primary liability for cleanup costs, Section 1321(f), impose liability on the "owner or *operator* of a vessel." It is at least a tenable construction of the statutory language, as applied to the facts of case, that "operator" should be construed to include to a tug operating a "dumb" barge. It is uncertain whether this construction of the statute was argued before the Coast Guard hearing examiner, but by imposing the fine solely upon Pittston, the examiner implicitly rejected this view. Similarly, the Government's stance in its action for cleanup costs in that Tug Ocean Prince is liable, if at all, under Section 1321(g) which concerns third party liability. Thus, the Government has adopted a contrary position and has not taken the required administrative steps to impose liability on plaintiff.

For these reasons, and in light of the *General Motors* decision, it appears to be the better course not to recognize a right to indemnity and, instead, to permit the absence of culpability to mitigate the amount of the fine. The case should be remanded to the Coast Guard to set a fine consistent with the degree of culpability attributable to the barge owner.

### ORDER

1. Plaintiffs are entitled to limit their liability to the value of the Tug Ocean Prince and the amount of her pending freight immediately after the grounding, for which amount Pittston is entitled to judgment with costs.

2. Pittston, not having been responsible for the oil spill, the Government's cause of action against it for cleanup costs is dismissed with costs.

3. The claims of plaintiffs and Pittston against the United States (in 74 Civ. 3358) and Pittston's counterclaim (in 75 Civ. 5801) are dismissed with costs.

4. Plaintiffs are liable to the United States for cleanup costs not to exceed $19,800.

5. The fine against Pittston is remanded to the Coast Guard for reconsideration consistent with this opinion. Pittston's claim for indemnity from plaintiffs is dismissed with costs.

6. If the parties cannot agree on the amount of cleanup costs or the amount of the limitation fund, they should advise the Court and the matter will be set for inquest.

SO ORDERED.